

NUMBER 13-16-00289-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG

JOYCE BLACK,                                                    Appellant,

v.

THE STATE OF TEXAS,                                       Appellee.

**On appeal from the 130th District Court
of Matagorda County, Texas.**

# OPINION

**Before Justices Rodriguez, Contreras, and Hinojosa
Opinion by Justice Hinojosa**

Appellant Joyce Black appeals from a judgment convicting her on one count of misapplication of fiduciary property in the aggregate amount of $200,000 or more, a first-degree felony at the time, *see* Act of Jun. 19, 1993, 73rd Leg., R.S., ch. 900, 1993 TEX. GEN. LAWS 3653 (amended 2017) (current version at TEX. PENAL CODE ANN. § 32.45(b)

(West, Westlaw through 2017 1st C.S.)),[1] and sentencing her to six years' confinement. In five issues, Black contends that (1) the evidence is legally "and/or" factually insufficient to sustain the conviction; and the trial court abused its discretion in overruling her (2) motion to exclude a witness from testifying on the ground that the witness's testimony would be prejudicial; (3) objection to the jury charge on the ground that it allowed for a conviction on less than a unanimous verdict; (4) motion to sever; and (5) objection to the testimony of two witnesses on hearsay and qualification grounds.   We affirm.

## I. BACKGROUND

Black, a native of Bay City, Texas, relocated back to her hometown in 2004 after residing in Los Angeles, California.   Upon Black's return, she established "Must Advance Racial Connections in Harmony" (M.A.R.C.H.), a non-profit charity; SES Reburnishing, a subsidiary of M.A.R.C.H.; and "New Beginnings for Labor Action Committee" (NuBLAC), a successor entity to M.A.R.C.H.   These entities purportedly obtained funds from governmental grant programs for use in rehabilitating houses of elderly residents in the Bay City area.

### A.   Investigation and Charges

In 2009, Thurman Gardner, Black's brother, reported to the Bay City Police Department that Black had gained online access to his bank account and made unauthorized transactions.   Bay City Police Department Sergeant Chadley Krenek

---

[1] Under the version of the statute governing Black's conviction, the misapplication of more than $200,000 constituted a first-degree felony.   *See* Act of Jun. 19, 1993, 73rd Leg., R.S., ch. 900, 1993 TEX. GEN. LAWS 3653 (amended 2017) (current version at TEX. PENAL CODE ANN. § 32.45(b) (West, Westlaw through 2017 1st C.S.)).   Under the current version of the statute the threshold for a first-degree felony is $300,000.   *See* TEX. PENAL CODE ANN. § 32.45(b).   We will refer to the current statute for simplicity's sake.

investigated Gardner's allegations by questioning Sheryl Vasek, a vice president at Gardner's bank who had interacted with Black, and by subpoenaing Gardner's bank records. Gardner's bank records showed online payments to, among other things, M.A.R.C.H. and credit cards which were held by Connie Johnson, an elderly Bay City resident. M.A.R.C.H., Inc.'s bank records, which were also subpoenaed during Sergeant Krenek's investigation, showed deposits related to Odis Wright, another elderly Bay City resident. Eventually, Sergeant Krenek handed the investigation over to the Texas Attorney General's Office.

The law enforcement agents theorized that, in addition to Black's conduct toward Gardner, she used the non-profit charities as a ruse to gain appointments from Johnson and Wright as their agent under power-of-attorney instruments, and Black used her fiduciary position for her benefit.

The indictment charged Black with one count of theft, and it described approximately thirty distinct instances of theft of money from Johnson, Gardner, and Wright. The same indictment also charged Black with one count of misapplication of fiduciary funds in various ranges, belonging to Johnson ($20,000 to $100,000), Gardner ($100,000 to $200,000), and Wright ($20,000 to $100,000). The misapplication count alleged that Black acted "contrary to an agreement under which [she] held the property or contrary to a law prescribing the disposition of said property, to-wit: Texas Probate Code, Durable Power of Attorney Act § 489B,[2] Duty to Inform or Account, and in a

---

[2] *See* Act of Jun. 11, 2011, 82nd Leg., R.S., ch. 823, 2011 TEX. GEN. LAWS 1902–03, 1905 (amended 2017) (current version at TEX. EST. CODE ANN. §§ 751.005–.006, §§ 751.101–.104 (West, Westlaw through 2017 1st C.S.)).

manner that involved substantial risk of loss of the property . . . ."  As to both counts, the indictment alleged that "all of the said amounts were obtained pursuant to one scheme or continuing course of conduct, and the aggregate value of the property obtained was $200,000 or more."

## B.     Motion for Severance

Before trial, Black moved to sever the offenses related to Johnson and Wright, arguing that Johnson does not believe himself to be a victim of any theft or misapplication; Gardner died before trial, and because of Gardner's death, any offense related to his funds should be dismissed; and trying the offenses together would necessitate the admission of prejudicial evidence.   At a pretrial hearing, the State argued that there was sufficient evidence that the theft and misapplication occurred as part of a continuing course of conduct, and therefore, severance should be denied.   The trial court denied Black's motion to sever as to each complainant, but it severed the theft count from the misapplication count.   Only the misapplication count proceeded to trial.   The theft count is not at issue in this appeal.

## C.     Trial

At trial, the State primarily relied on Sergeant Krenek and two staff members from the Texas Attorney General's Office—Sergeant Randy Muenzler, a peace officer assigned to the financial investigations section, and Stephen Thompson, a research specialist assigned to the white-collar crime and public integrity section—to sponsor and explain the financial documents admitted into evidence.

4

### 1. Johnson

Rubye Davis Brown, Johnson's great niece, testified that she could not recall Black having a close relationship with Johnson until Rubye Herbert, Johnson's daughter, became terminally ill. Upon Herbert's illness, Brown recalled Black visiting Johnson. Black assisted Johnson with Herbert's funeral arrangement after her May 19, 2008 death. According to Brown, she and Johnson were to share in the proceeds of Herbert's life insurance policy. However, Brown's payment was delayed because the life insurance carrier misunderstood that Brown had assigned her share of the proceeds to Johnson. The State posited that the misunderstanding stemmed from Black faxing two power-of-attorney instruments to a benefit assistant at the life insurance carrier: one naming Johnson as Herbert's agent and another naming Black as Johnson's successor agent.

According to Sergeant Krenek, Black began acting as Johnson's agent by transferring money and opening credit card accounts in the months following Herbert's death. Thompson analyzed the records that Sergeant Krenek had subpoenaed and summarized them into a timeline. According to Sergeants Muenzler and Krenek, Thompson's timeline shows Black's breach of fiduciary responsibilities to Johnson, Gardner, and Wright.

Sergeant Muenzler testified that he questioned Black during his investigation, and regarding M.A.R.C.H.'s bank account, Black admitted that she "used it for some charitable endeavors, but also for some of her personal expenses." Thompson's timeline shows that in June 2008 the balance in M.A.R.C.H.'s bank account was $18.01 and that in July 2008 Johnson's share of Herbert's life insurance proceeds, $16,000, was transferred from

Johnson's bank account to M.A.R.C.H.'s bank account. Meanwhile, Black, acting as Johnson's agent, opened credit card accounts at Home Depot, Chase, Discover, and American Express in Johnson's name. Over the following twenty months, the accumulated charges or cash advances on those cards, excluding interest, penalties, and late fees, totaled $137,624.78. The underlying credit card statements showed charges for, among other things, meals at Golden Corral Restaurant, wigs from wigs.com, and airfare to and hotel accommodations in Washington D.C. in January 2009.[3]

On August 22, 2008, Johnson executed a different power-of-attorney instrument that named Black as his initial agent instead of a successor agent as the previous power-of-attorney instrument did. On December 31, 2008, the balance in M.A.R.C.H.'s bank account was $57.36 and Black, on Johnson's behalf, executed a reverse mortgage on Johnson's house. Thompson's timeline shows that $60,641 in Johnson's reverse mortgage proceeds was deposited into M.A.R.C.H.'s bank account on January 6, 2009. By February 19, 2009, the balance in M.A.R.C.H.'s bank account had dwindled to $100.03.

As Sergeants Muenzler and Krenek conducted their investigation, they visited with Johnson about his many credit card accounts. Sergeant Muenzler recalled that Johnson stated, "I ain't got no credit cards." The sergeants showed Johnson the credit card statements that had been obtained through subpoena, but, according to Sergeant

---

[3] Yolanda Mitchell, a friend of Black's, testified that NuBLAC sponsored trips that allowed inner city or economically challenged students and their parents to attend presidential inaugural festivities. According to Mitchell, Black, Black's mother China Thompson, Johnson, and another guest attended President Obama's inauguration. Mitchell acknowledged that none of the attendees were economically disadvantaged youth.

6

Muenzler, Johnson expressed disbelief and stated, "[S]omebody's lying here."  The State called Johnson as a hostile witness.   On direct examination by the State, Johnson testified:

Q.      What did you say she [Black] pays?

A.      I said she pays her own bills and pays mine, too.   All that I ain't got—my money won't cover—she pays out of her own pocket, Joyce Black.

Q.      Okay.   And has it always been that way?

A.      Right.

Q.      There wasn't a time when she was paying her bills with your credit cards?

A.      No.   No.

Q.      Or out of your bank account?

A.      No.   No.

        . . . .

Q.      . . . You trust Ms. Black, right?

A.      Right.   All the way.

Q.      You trust her to take care of your money?

A.      Right.

Q.      You trust her to keep it safe for you?

A.      Right.   Well, I don't have any.

Q.      Do you trust that that money is there for you whenever you need it?

A.      Right.   If I got any.

Q.      And you trust Ms. Black not to take advantage of you?

A. Right.

Q. And you trust her not to take your money and use it for her personal use?

A. Right.

Q. You trust her not to use money for her needs but your needs; is that right?

A. Right.

Q. And did you trust Ms. Black for all these things when you gave her a power of attorney?

A. Right.

Q. And as far as you know, she's never violated that trust?

A. Right.

Q. She hasn't taken any money from you.

A. Right.

Black's counsel asked Johnson on cross-examination, "Whatever money she has, she could use for anyway she wants?" Johnson answered, "Right."

**2. Gardner**

According to Gardner's banking records, in July 2009 a total of $110,094 was deposited into Gardner's bank account by the U.S. Department of Veterans Affairs. Thereafter, Gardner's bank account received $4,073 in monthly deposits from the Veterans Affairs Department. Sergeant Muenzler testified that Gardner was entitled to receive monthly benefits and that the six-figure deposit represented a retroactive award of benefits. Vasek, the vice president where Gardner banked, testified that, on

8

September 3, 2009, Black presented her with a power-of-attorney instrument Gardner had executed and the bank statement reflecting the six-figure deposit; Black asked to access Gardner's bank account. According to Vasek, Black wanted to use the funds in Gardner's bank account to pay his bills and pre-pay for his funeral. Vasek explained that bank policy required verification from Gardner, and, according to Vasek, Black "wasn't very happy about it."

On September 8, 2009, Gardner's banking records show that online access was created. On that day, PayPal verification deposits of sixteen cents and two cents were made into Gardner's account. Sergeant Muenzler calculated that Black initiated a total of $75,030.42 in online transactions with funds from Gardner's bank account for the benefit of someone other than Gardner. For example, online transactions were made in the amount of $1,028.11 for automobile insurance premiums for vehicles driven by Black and her husband, James Smith; $9,600 for charges made to a Chase credit card in Johnson's name; and $9,623 for a PayPal account in Black's name. Vasek explained that the online transactions were cancelled and the funds were returned to Gardner's bank account because Sergeant Krenek relayed Gardner's report of unauthorized online transactions during a period in which bank policy allowed unauthorized transactions to be undone.

In addition to online transfers of money, the investigators discovered that Black had received an interest in real property belonging to Gardner. Sergeant Krenek testified that in 2003, China Thompson, Gardner's and Black's mother, conveyed to Gardner a house. Appraisal records showed that at the time the land was valued at $2,500 and the

9

house was valued at $3,876. In 2004, Gardner received $52,774 in funds from GrantWorks, a program that provides housing to disabled individuals, for the construction of a new home on his land. The following year, a deed with Gardner's signature was executed transferring the property to China Thompson and Black as tenants in common. During the investigation, Black emailed the district attorney regarding the deed to Gardner's home, writing:

> Submitted for your records is a copy of a valid executed power of attorney document signed by Thurman Gardner in 1989 . . . This instrument was executed as a matter of necessity due to his unstable mindset. As a valid instrument executed with an "indefinite status" it has been utilized since 1989 on his behalf to conduct many areas of his business.

> I had solely maintained these powers until 2007. Thurman became hospitalized and I was unable to get to Bay City in a timely manner therefore, it was decided that China M. Thompson (mother) be given the same degree of powers as I, so that she could conduct business on his behalf without difficulty. This thought caused another document to be generated which added her name along with mine as his attorneys in fact.

> Unfortunately, mother later misplaced her copy of that particular document which had been prepared and executed at the office of Dan Hayes, Esq . . . (However, having once utilized a signature stamp with his signature, there were several stamped documents kept in my files (Texas) for mothers sake just in case she needed them.)

> . . .

> My reason for this detail explanation is to enlighten you of a set of facts that may be of significance given the fact that I have executed other legal documents utilizing that same 1989 POA, In particular a Warranty Deed which I have executed, forfeiting Thurman Gardners nership [sic] of a parcel of real property (house) which I/we gave him with conditions.

### 3. Wright

Tasha Viola, Wright's niece, testified that sometime between August and December 2008, Black began visiting Wright. Viola recalled that Black's visits confused

10

Wright.

On September 10, 2009, Wright appointed Black as his agent in a power-of-attorney instrument. The following year, Black, as Wright's agent, executed a reverse-mortgage on Wright's home. Sergeant Muenzler testified that the reverse-mortgage file showed Black had requested that the $45,251.38 proceeds be wired into the bank account of Black's husband, Smith. However, the reverse-mortgage bank rejected Black's request. Instead, the proceeds were wired into Wright's bank account. Wright's bank records show that upon Wright's receipt of the reverse-mortgage proceeds, Smith received a check for $42,000 from Wright's bank account. According to Sergeant Muenzler's review of Wright's financial records, a total of $32,955.71 of Wright's reverse-mortgage proceeds made its way to Black either directly from Wright's bank account or funneled through Smith's bank account.

Carlton Brooks, Wright's next-door neighbor, testified that Black informed him that she worked for a governmental agency that provided funding for elderly people. Black told Brooks that Wright's home was uninhabitable and that she planned to construct a garage for Wright's van and level the home's floors. Brooks disagreed with Black's characterization of Wright's house as uninhabitable. Brooks, who voluntarily mowed Wright's yard, was concerned that Wright could not afford the work that was in the making. While Wright's house was being renovated, Viola, who resided near Wright, introduced herself to Black. Black, according to Viola, ignored her. During Viola's attempt to meet Black, she noticed that Black had Wright's checkbook.

At some point, Black arranged for Wright to move in with Johnson. Brooks

observed that, during Wright's absence from his house, Black used Wright's residence as her campaign headquarters during Black's unsuccessful run for mayor of Bay City.

In April 2010, Black arranged for Wright to be admitted into Sweeney House, a skilled nursing facility. Kari Schroeder, a social worker at Sweeney House, testified that Black, using her authority as Wright's agent, admitted Wright and checked the "do not resuscitate" instruction in Wright's admission paperwork. On May 18, 2010, Wright revoked the power-of-attorney instrument.

## D.    Jury Charge

The jury charge included the following definitions:

> "Fiduciary" includes an officer, manager, employee, or agent carrying on fiduciary functions on behalf of a fiduciary, or any person acting in a fiduciary capacity.

> "Misapply" means deal with property contrary to: (A) an agreement under which the fiduciary holds the property; or (B) a law prescribing the custody or disposition of the property.

> "Owner" means a person who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the defendant.

> "Benefit" means anything reasonably regarded as economic gain or advantage, including benefit to any other person in whose welfare the beneficiary is interested.

> "Property" means:  (A) real property; (B) tangible or intangible personal property including anything severed from land; or (C) a document, including money, that represents or embodies anything of value.

The jury charge also listed certain provisions in then-section 489B of the probate code, now housed in the estates code. [4]   *See* TEX. EST. CODE ANN. §§ 751.005–.006,

---

[4] The jury charge specifically provided:

12

§§ 751.101–.104 (West, Westlaw through 2017 1st C.S.). The jury charge then set out

the following paragraph:

> Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that the defendant, Joyce Black, on or about the 14th day of July, 2008, and before the presentment of this

---

The Texas Probate Code §489B, Duty to Inform and Account, provides that

(a)    The attorney in fact or agent is a fiduciary and has a duty to inform and to account for actions taken pursuant to the power of attorney.

(b)    The attorney in fact or agent shall timely inform the principal of all actions taken pursuant to the power of attorney. Failure of the attorney in fact or agent to inform timely, as to third parties, shall not invalidate any action of the attorney in fact or agent.

(c)    The attorney in fact or agent shall maintain records of each action taken or decision made by the attorney in fact or agent.

(d)    The principal may demand an accounting by the attorney in fact or agent. Unless otherwise directed by the principal, the accounting shall include:

    (1)    the property belonging to the principal that has come to the attorney in fact's or agent's knowledge or into the attorney in fact's or agent's possession;

    (2)    all actions taken or decisions made by the attorney in fact or agent;

    (3)    a complete account of receipts, disbursements, and other actions of the attorney in fact or agent, including their source and nature, with receipts of principal and income shown separately;

    (4)    a listing of all property over which the attorney in fact or agent has exercised control, with an adequate description of each asset and its current value if known to the attorney in fact or agent;

    (5)    the cash balance on hand and the name and location of the depository where the balance is kept;

    (6)    all known liabilities; and

    (7)    such other information and facts known to the attorney in fact or agent as may be necessary to a full and definite understanding of the exact condition of the property belonging to the principal.

(e)    Unless directed otherwise by the principal, the attorney in fact or agent shall also provide to the principal all documentation regarding the principal's property.

(f)    The attorney in fact or agent shall maintain all records until delivered to the principal, released by the principal, or discharged by a court.

indictment, in Matagorda County, Texas, did then and there intentionally, knowingly, or recklessly misappl[ied] property, to wit: funds of the value of $1,500 or more but less than $20,000 that the said defendant held as a fiduciary, contrary to an agreement under which the said defendant held the property or contrary to a law prescribing the disposition of said property, to-wit Texas Probate Code, Durable Power of Attorney Act § 489B, Duty to Inform or Account, and in a manner that involved substantial risk of loss of the property to Connie Johnson, the owner of said property, and the person for whose benefit the property was held, by converting the funds for personal use or for the benefit of another person besides the owner for whose benefit the funds were held;

The jury charge then contained three paragraphs beginning with "or, that defendant, on or about and between," and listing three different date ranges and funds belonging to Johnson between $20,000 and $100,000; funds belonging to Gardner between $100,000 and $200,000; or funds belonging to Wright between $20,000 and $100,000. After these four paragraphs, the jury charge provides:

and if you further find that the amounts were obtained pursuant to one scheme or continuing course of conduct and the aggregate value of the property misapplied was more than $200,000.00 or more [sic], you will find the defendant "Guilty" of Misapplication of Fiduciary Property as charged in the indictment and so say by your verdict. But if you do not so find, or if you have a reasonable doubt as to the defendant's guilt, you will acquit the defendant of Misapplication of Fiduciary Property, and say by your verdict, "Not guilty."

Black objected to the jury charge because she believed it allowed for a conviction on a less than a unanimous verdict. Specifically, Black asserted that the jury charge "should make clear that unanimous verdict is required on each person asserted in the continuing violation." The trial court overruled Black's objection.

The jury returned a guilty verdict. Black elected for the jury to assess punishment, and it recommended six years' confinement and a fine of $10,000. The trial court signed a judgment of conviction and imposed the sentence and fine that the jury recommended.

14

It also ordered that Black pay $43,356 in restitution to Wright and $87,833.69 to Johnson and that Black execute a deed conveying Gardner's home to his estate. This appeal followed.

## II. DISCUSSION

### A. Legal Sufficiency[5]

#### 1. Standard of Review

"The standard for determining whether the evidence is legally sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Johnson v. State*, 364 S.W.3d 292, 293–94 (Tex. Crim. App. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in *Jackson*); *see Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.). The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Brooks*, 323 S.W.3d at 899; *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). Reconciliation of conflicts in the evidence is within the fact-finder's exclusive province. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000). We resolve any inconsistencies in the testimony in favor of the verdict. *Bynum v. State*, 767 S.W.2d 769, 776 (Tex. Crim. App. 1989) (en banc).

We measure the sufficiency of the evidence by the elements of the offense as

---

[5] Black purports to challenge the factual sufficiency of the evidence. However, the Texas Court of Criminal Appeals has abolished factual sufficiency review. *See Howard v. State*, 333 S.W.3d 137, 138 (Tex. Crim. App. 2011) (citing *Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010) (plurality op.)). Black's factual sufficiency argument essentially challenges the legal sufficiency of the evidence. Accordingly, we construe it as a legal sufficiency challenge.

15

defined by a hypothetically correct jury charge.  *Cada v. State*, 334 S.W.3d 766, 773 (Tex. Crim. App. 2011) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the offense for which the defendant was tried.  *Id.*

### 2. Applicable Law

Section 32.45 of the Texas Penal Code provides that a "person commits an offense if he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary . . . in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held."  Tex. Penal Code Ann. § 32.45(b).  The definition of "fiduciary" includes, among other things, "an attorney in fact or agent appointed under a durable power of attorney."  *Id.* § 32.45(a)(1)(B).  "Misapply" means deal with property contrary to an agreement under which the fiduciary holds the property; or a law prescribing the custody or disposition of the property.  *Id.* § 32.45(a)(2).

### 3. Analysis:  Misapplication

Regarding Johnson and Wright, Black attempts to cabin our legal sufficiency review by contending that there is no evidence in support of the second prong of the definition of "misapply," which penalizes dealing with property contrary to "a law prescribing the custody or disposition of the property."  *Id.*  Specifically, Black argues that the State presented no evidence of a request for an accounting under the durable power-of-attorney statute.  *See* Tex. Est. Code Ann. § 751.104(a) (West, Westlaw

16

through 2017 1st C.S.) (providing that the principal may demand an accounting by the agent).

Relatedly, Black argues that the principals "agreed" she could do what she wanted with their funds. As evidence, Black points to her cross-examination of Thompson, which provides:

Q. If I have a power of attorney with my daughter, okay, and she's my fiduciary, I can tell her at any time I want, "You know what, Baby, I want you to use that for yourself." I have that right, don't I?

A. When you say "that"—

Q. That money. Money I have that you're holding fiduciary for me, I would tell my daughter, "Baby, I want you to use it for yourself and for your kids." I have a right to tell my daughter who is my fiduciary she could do that, don't I?

A. You have the right to say that money is a gift, yes.

Q. And that's my point. When it comes to my money, nobody from Austin can come down here to tell me what to do with my money, right?

A. Nobody—let me make sure I understand your question: The Government cannot tell you what to do with your money?

Q. Yes, sir. I have control of that fiduciary relationship, the principal. I have control of that. Would you agree with that, sir?

A. As the principal, yes, you have control over giving your money to a fiduciary or not.

The State asserts that Black's focus on a request for an accounting by the principals misses the mark. We agree. Furthermore, we conclude that section 32.45(a)(2) of the Texas Penal Code encompasses failure to inform. *See* TEX. EST. CODE ANN. § 751.102(a) (West, Westlaw through 2017 1st C.S.) ("The agent shall timely

17

inform the principal of each action taken under a durable power of attorney."). Sergeant Muenzler recalled that when asked whether he had any credit cards, Johnson answered, "I ain't got no credit cards." This constitutes legally sufficient evidence that Black failed to inform Johnson, satisfying the second prong of the definition of "misapply" as to Johnson. *See id.*; *see also* TEX. PENAL CODE ANN. § 32.45(a)(2). Moreover, Black's reliance on Johnson's in-court testimony—wherein Johnson agreed that Black could use his money "anyway she wants"—fails to appreciate the standard of review that we must apply. It is the jury's province to weigh Johnson's in-court testimony against Sergeant Muenzler's recollections of Johnson's statements as the investigation was underway. *See Wyatt*, 23 S.W.3d at 30.

Black's reliance on Thompson's testimony that Black could use his funds "anyway she wants" does not render the other evidence legally insufficient. Black's contention that she stands in a principal's stead and may gift to herself any amount agreed to by the principal is belied by the estates code. An agent's authority to gift a principal's property must be specifically granted in a power-of-attorney instrument, and even then, it is subject to certain limitations. *See* TEX. EST. CODE ANN. § 751.032(b) (West, Westlaw through 2017 1st C.S.) ("Unless the durable power of attorney otherwise provides, a grant of authority to make a gift is subject to the limitations prescribed by this section."). "Language in a durable power of attorney granting general authority with respect to gifts authorizes the agent to only" make gifts in an amount in accordance with federal tax law. *Id.* § 751.032(c). The instruments appointing Black as Wright's and Johnson's agent lack the statutorily mandated provision regarding gifts. *See id.* § 751.032(b); *see also*

18

*Natho v. State*, No. 03-11-00498-CR, 2014 WL 538787, at *3 (Tex. App.—Austin Feb. 6, 2014, pet. ref'd) (mem. op., not designated for publication) (noting that a principal did not grant an agent authority to make gifts under a statutory durable power of attorney). Accordingly, the "gifts" constituted misapplication. *See* TEX. PENAL CODE ANN. § 32.45(a)(2).

As for Wright, the State contends Wright "promptly revoked [Black's] power of attorney" when he "finally discovered that she had misappropriated" his funds, inferring a lack of knowledge from the revocation coupled with the financial predicament Wright was left in after the expenditure of the reverse-mortgage proceeds. Referencing *Coleman v. State*, 131 S.W.3d 303, 308 (Tex. App.—Corpus Christi 2004, pet. ref'd),[6] the State contends that Black also acted contrary to Wright's agreement with Black. According to the State and its reading of *Coleman*, a fiduciary, such as Black, is obligated to act in the best interest of a principal. Thus, the "agreement" between Wright and Black incorporated a best interest standard.

In *Berry v. State*, the court of criminal appeals expounded on the meaning of "any other person acting in a fiduciary capacity, but not a commercial bailee," which along with attorney-in-fact is included in the definition of "fiduciary" under the misapplication statute. 424 S.W.3d 579, 585 (Tex. Crim. App. 2014). It held that "one acts in a 'fiduciary capacity' for purposes of the misapplication statute if his relationship with another is based not only on trust, confidence, good faith, and utmost fair dealing, but also on a justifiable

---

[6] In *Coleman v. State*, we wrote that "a fiduciary refers to a person or entity having a duty, created by his undertaking, to act primarily for another's benefit in matters connected to the undertaking." 131 S.W.3d 303, 308 (Tex. App.—Corpus Christi 2004, pet. ref'd)

expectation that he will place the interests of the other party before his own." *See id.* (citing BLACK'S LAW DICTIONARY 702 (9th ed. 2009)). According to the plain language of *Berry*, the best-interest standard applies to all fiduciary relationships, including those between an agent and principal. *See id.* Moreover, *Berry* and *Coleman* suggest that the primacy of a principal may be more properly categorized under the second prong of the definition of "misapply" because it emanates from our common law. *See id.*; *Coleman*, 131 S.W.3d at 308. Thus, "a law prescribing the custody or disposition of the property" includes the best-interest standard. *See* TEX. PENAL CODE ANN. § 32.45(a)(2); *Berry*, 424 S.W.3d at 585; *Coleman*, 131 S.W.3d at 308.

With this categorization in mind, there is legally sufficient evidence that Black acted contrary to a law prescribing the disposition of Wright's property by not acting in Wright's best interest. *See* TEX. PENAL CODE ANN. § 32.45(a)(2). Black took out a reverse-mortgage under the pretense that Wright's house was unlivable and in need of renovation. Regardless of whether the jury believed Brooks' description of Wright's house as habitable, a rational jury may have concluded that Black's receipt of most of the reverse-mortgage proceeds, as recounted by Sergeant Muenzler, was not in Wright's best interest. *See* TEX. PENAL CODE ANN. § 32.45(a)(2)(B) (providing that the definition of "misapply" includes dealing with property contrary to "a law prescribing the custody or disposition of the property"); *see also Berry,* 424 S.W.3d at 585; *Coleman*, 131 S.W.3d at 308.

### 4.     Analysis:   Other Arguments

Black, without any reference to legal authority, contends that Gardner did not lose

20

any of the funds that she tried to transfer using the online access she obtained. She contends that the bank's cancelation of the online transaction constitutes no evidence of loss.[7] But the misapplication statute requires "substantial risk of loss to the owner of the property," not actual loss. *See* TEX. PENAL CODE ANN. § 32.45(b). In this case, the transactions were undone because Sergeant Krenek relayed Gardner's report of unauthorized online transactions during a period in which bank policy allowed unauthorized transactions to be undone. A rational jury may have concluded that Black's initiation of the online transactions placed those funds at a "substantial risk of loss" to Gardner. *See id.*; *see also Johnson*, 364 S.W.3d at 293–94; *Brooks*, 323 S.W.3d at 899; *Lancon*, 253 S.W.3d at 707.

Black also argues that because there was no dispute that Wright signed a check to Smith for $42,000 there is legally insufficient evidence as to misapplication regarding those funds. Black's focus on Wright's signature is unpersuasive. According to Sergeant Muenzler's review of Wright's financial records, a total of $32,955.71 of Wright's reverse-mortgage proceeds made its way to Black either directly from Wright's bank account or funneled through Smith's bank account. The jury was free to consider Sergeant Muenzler's testimony together with Wright's financial records, which were admitted into evidence, in determining whether Black misapplied Wright's funds. *See* TEX. PENAL CODE ANN. § 32.45(a)(2); *see also Johnson*, 364 S.W.3d at 293–94; *Brooks*, 323 S.W.3d at 899; *Lancon*, 253 S.W.3d at 707.

---

[7] Notably, Black does not argue that she was not acting as a fiduciary when she gained online access. According to Sergeant Muenzler, Black claimed that the power-of-attorney instrument Gardner had signed gave her authority to gain online access to his bank account.

**5.    Summary**

We conclude that there is legally sufficient evidence Black misapplied funds belonging to Gardner, Johnson, and Wright.   *See Brooks*, 323 S.W.3d at 899; *Lancon*, 253 S.W.3d at 707.   Black's first issue is overruled.

**B.    Wright's Testimony**

In Black's second issue, she complains that the trial court abused its discretion in balancing the probative value against possible prejudice of Wright's testimony.   Black's only reference to authority is Texas Rule of Evidence 403.   *See* TEX. R. EVID. 403.   Black also contends, without referencing any additional authority, that Wright was mentally incompetent to testify.   Aside from Black's assertion that Wright was incompetent to testify due to dementia, she fails to articulate any other basis for how Wright's testimony was prejudicial.   We conclude that Black's argument that the trial court abused its discretion in balancing the probative value against possible prejudice of Wright's testimony is inadequately briefed.   *See* TEX. R. APP. P. 38.1(i) (providing that the argument must contain "appropriate citations to authorities and to the record").   Black's second issue is overruled.

**C.    Unanimity**

In Black's third issue, she asserts that the jury charge allowed for less than a unanimous verdict because the alleged misapplications were submitted in the disjunctive: Johnson ($20,000 to $100,000), Gardner ($100,000 to $200,000), or Wright ($20,000 to $100,000).

The State's reference to *Kent v. State* is apt.   *See* 483 S.W.3d 557, 561–62 (Tex.

Crim. App. 2016). In *Kent*, a mortgage broker was convicted of theft from four different complainants in an aggregate amount exceeding $200,000. *Id.* at 558. The defendant, like Black, objected to the jury charge on the ground that although the amount of the thefts can be aggregated, there must be a unanimous verdict as to each separate unit of prosecution. *Id.* at 559. The court of criminal appeals recognized that the theft charge was governed by an aggregating statutory provision, *see* TEX. PENAL CODE ANN. § 31.09 (West, Westlaw through 2017 1st C.S.), and it held:

> For an aggregated-theft case, we hold that unanimity requires that the jurors agree that the threshold amount has been reached and that all the elements are proven for each specific instance of theft that the individual juror believes to have occurred. Every instance of theft need not be unanimously agreed upon by the jury.

*Kent*, 483 S.W.3d at 560–62. The misapplication of fiduciary property charge is governed by an identical statutory provision, which provides, "When amounts are obtained in violation of this chapter pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of offense." TEX. PENAL CODE ANN. § 32.03 (West, Westlaw through 2017 1st C.S.).

Contrary to Black's argument, *Kent* holds that the unanimity requirement is satisfied if the aggregate amount of all misappropriated funds exceeds the minimum threshold of the penal code. *Kent*, 483 S.W.3d at 560–62. Moreover, *Kent* rejects Black's contention that every instance of misapplication must be unanimously agreed upon by the jury. *See id.* Black's third issue is overruled.

23

**D.    Severance**

In Black's fourth issue, she makes three arguments.  First, she argues that the trial court erred in denying her motion to sever because "the State did not properly allege 'pursuant to one scheme or continuing course of conduct,' and even if they did, the evidence in the case did not support that Thurman Gardner's allegations were pursuant to one scheme or continuing course of conduct."  Second, she argues that a power-of-attorney instrument was not used regarding her conduct towards Gardner.  Third, she argues that she was prejudiced by the denial of a severance.

Only Black's third argument bears any resemblance to what she preserved.  *See* TEX. R. APP. P. 33.1.  In Black's written motion for severance, she focused only on the theft count and made no mention of the misapplication count.  At the hearing, Black sought a separate trial for each complainant.  The State countered that, while Black may have been entitled to a severance of the theft and misapplication counts, she was not entitled to a further severance as to each complainant because the aggregation provision prohibited such a severance.  In reply, Black argued:

> Theft, violation of fiduciary—Count 1 and Count 2.  We have a right to have those severed.  Petitioner—she just stated that she knows we have that right.  So we're going to ask that they be severed, along with the fact that we have three individuals that we have to address each one individually.

> In this case we think that's prejudicial.  We think it's a violation of her Fifth, Sixth, Fourteenth Amendment of the U.S. Constitutional Rights; Article 1, Section 10 of the Texas Constitution, your Honor.  We just think it's prejudicial for her to have to address three different individuals.

The court of criminal appeals has "held that Section 31.09 [, the aggregation

24

statute relating to theft,] creates one offense for purposes of severance, jurisdiction, punishment, limitations, and venue." *Kent*, 483 S.W.3d at 561–62 (citations omitted). Black fails to explain how her contention of prejudice circumvents the rule in *Kent*.

As to the other arguments in Black's fourth issue, they have not been preserved. *See* TEX. R. APP. P. 33.1. Black's fourth issue is overruled.

## E.    Expert Testimony

In Black's fifth issue, she argues that the trial court abused its discretion by overruling her objections to certain testimony by Steve Reis, the District Attorney of Matagorda County, and Sergeant Krenek. Black characterizes both as providing expert testimony in probate law, for Reis, and mental health, for Sergeant Krenek. Black argues that the "accumulation of this type of evidence was prejudicial" and "difficult for her to overcome."

The State responds that Black has inadequately briefed her complaint. It notes that Black's argument quotes approximately 140 lines of transcript, which contains 27 questions and answers and nine objections. The State contends that it cannot readily ascertain which specific pieces of testimony Black maintains were erroneously admitted over proper, timely objections. We agree with the State.

Blacks fails to cogently argue how the trial court abused its discussion in overruling the nine objections she lodged in the referenced testimony. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a succinct, clear, and accurate statement of the arguments made in the body of the brief."). Black's fifth issue is overruled.

### III. CONCLUSION

The judgment of the trial court is affirmed.

LETICIA HINOJOSA
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
5th day of April, 2018.