

# NUMBER 13-15-00513-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

KEVIN LOZANO A/K/A KEVIN LOZAWO,                      Appellant,

**v.**

THE STATE OF TEXAS,                                      Appellee.

### On appeal from the 357th District Court
### of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Perkes
Memorandum Opinion by Justice Perkes**

Appellant Kevin Lozano a/k/a Kevin Lozawo (Lozano) appeals his conviction for

one count of murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02 (West,

Westlaw through 2017 1st C.S.). The jury assessed punishment at forty-five years'

imprisonment. By four issues,[1] Lozano argues: (1) the evidence is legally insufficient to disprove self-defense, defense of a third party, and sudden passion; (2) the trial court erred by failing to instruct the jury that Charles Owen was an accomplice as a matter of fact, and the accomplice testimony was uncorroborated; (3) the trial court erred by improperly including "criminal activity" language and the "provoking the difficulty" doctrine in the jury charge as limitations upon the law of self-defense; and (4) the trial court erred in denying Lozano's motion for new trial. We affirm.

## I. BACKGROUND

Don Anthony Torres was murdered on May 17, 2014. According to Lozano, he spent the early hours of May 17 with his cousin, Jerry Lozano, and Torres, a friend of his cousin. Torres was described as petite, standing 5′2″ at 130 pounds. By contrast, Lozano was 5′10″ and 280 pounds, and Jerry was over 200 pounds. The three men parted ways around 2 a.m., after Lozano's vehicle became stranded because of a flat tire. Lozano testified that a heated verbal exchange between Jerry and Torres resulted in Torres leaving separately on foot. Lozano denied knowing the reason for the argument and remained with Jerry for the remainder of the morning.

Torres's mother, Estela Torres, stated she received a call from her son between 2 a.m. and 3 a.m., asking for a ride home. She testified that she and her husband, Teodoro Torres, drove around looking for their son but were unable to locate him. When they returned home around 5 a.m., she saw Torres standing on their front lawn, carrying a

---

[1] Lozano raises nine points of error in his brief on appeal. We have consolidated the points raised: (1) points one, two, and three (insufficiency of the evidence); (2) points four and seven (accomplice witness as a matter of fact); (3) points five, six, and eight (unlimited instruction on self-defense); and (4) point nine (motion for new trial).

machete and sword.[2]   She described Torres as being very upset.   Although Torres did not tell his mother what was wrong, she overheard a phone call between Torres and an unknown caller.   Her son stated, "I'm here.   I'm here at my house, putos.   I am here at my house, putos.   What do you want?   I'm here in my house."[3]

Estela testified her son suffered from bipolar disorder and schizophrenia.   She distanced herself from him during times of increased agitation.   Although she did not recall what time, Estela left the residence at her husband's insistence.   When she was getting into her vehicle, her son went up to her and said, "Mom, just for you to know, just for you to know that this is not the first time that they kill."   Contrary to Estela, Teodoro testified that when they arrived home, their son was inside.   Teodoro did not recall overhearing Torres receive a phone call nor did he see Torres speak to Estela prior to her departure.   Teodoro, however, did remember Torres yelling profanities.   Teodoro testified he fell asleep shortly after Estela left.

Detective Eleazar Garcia with the Brownsville Police Department testified that an examination of Torres's cell phone records revealed "insulting" and "violent" text messages exchanged between Jerry and Torres.   The exchange ended at approximately 5:20 a.m., when Torres received a one-word text message from Jerry: "outside."   Torres used his phone only one other time after 5:20 a.m.; he attempted to call his girlfriend at 5:24 a.m., but the call went unanswered.   Video surveillance from a neighboring house

---

[2] The "machete" was described by Torres's father as a garden tool he used to cut the lawn. According to Torres's parents, the sword was decorative and previously hung on Torres's bedroom wall.

[3] According to trial court translator, the Spanish word "putos" translates to "f**kers" or "motherf**kers."

3

showed only one vehicle passing in front of Torres's residence between 5:25 a.m. and 5:50 a.m.: a red truck.[4]

At trial, Lozano and the State's witness, Charles Owen, provided similar descriptions of what transpired at Torres's residence. It is undisputed that Owen, the owner of a red Nissan Frontier truck, was not with Lozano, Jerry, and Torres earlier that morning. Owen testified he arrived at Jerry's house around 5 a.m. because, one week prior, he had made arrangements with Jerry to give Jerry a ride to the bus station. Owen stated that on May 17, their plans changed, and the men decided to go buy some marijuana before dropping Jerry off. Owen drove Jerry and Lozano in his truck, while Jerry provided the directions to the "drug house." Jerry sat in the front passenger seat, and Lozano sat in the backseat. Because the truck did not have working air conditioning, the men drove with the windows rolled down.

According to Owen, Jerry guided him to Torres's house and instructed him when to stop. Owen testified he heard screaming and saw Torres running down the yard with a machete and sword in-hand before he was able to put the vehicle in park. Torres swung the sword, striking the vehicle's front passenger door exterior just below the window, leaving a less-than-one-half-inch scrape. Torres's sword broke apart from the handle in the process. Owen used the word "bing" to describe the sound he heard when Torres hit his vehicle. Immediately after, Owen saw Lozano shoot Torres. Owen testified he quickly drove away, without instruction from anyone in the vehicle. Owen said he was scared, he did not know the directions that Jerry had given him would lead to Torres's residence, and he did not know Lozano was going to shoot Torres. Owen

---

[4] The recording device did not have audio capabilities, and because of the angle, the video did not capture the shooting or the events leading up to the shooting.

4

testified he only agreed to drive them to buy marijuana and drop off Jerry at the bus station.

Lozano testified that he acted in self-defense and that the weapon accidentally discharged. And, contrary to Owen, Lozano said Jerry had started to exit the vehicle when Torres came charging forward, armed:

[Lozano]: I leaned over, and Mr. Owen, he had his firearm, I guess, in the back seat, grabbed it. As soon as I saw Mr. Don charging, two metal, you know, long—at the moment I didn't know what they were, but scared the—scared me. And I reached over and I just grabbed it and he, boom, bing, he attacked my cousin. And—

[Counsel]: Did you know when he first came out who he was going to attack?

[Lozano]: No, sir.

[Counsel]: Did you think he was going to attack you?

[Lozano]: Maybe.

[Counsel]: You couldn't discount it?

[Lozano]: No, sir, I couldn't discount it.

[Counsel]: Did it frighten you?

[Lozano]: Yes, of course.

[Counsel]: Okay. Did you fire at him?

[Lozano]: No, sir.

[Counsel]: What were you trying to do?

[Lozano]: I was just maybe, I guess, able to by the sight of it maybe he would have stopped some, but it went off, sir.

[Counsel]: And were you trying to scare him?

5

[Lozano]:      I guess after the fact I—yes . . . . It happened so quick.   It wasn't—I kind of, in that moment's notice I kind of—I thought he would get frightened by the sight of the rifle or something, but when he hit the truck, I just, I went like that, and it jerked and it went off, sir.   Yes, sir.

[Counsel]:      And you were trying to scare him?

[Lozano]:      Well, yes.   After the fact that [sic] I think about it, it's nothing else is—I kind of thought he would get scared just by the sight of it, you know?

[Counsel]:      Did you think you were going to be stabbed by him?

[Lozano]:      Pretty possibly, yes, either him or my cousin.   Either my cousin or I, sir.

[Counsel]:      You were both under attack in your mind?

[Lozano]:      Yes, sir.

During cross-examination, Lozano conceded his actions, although primarily accidental, were motivated by protection of himself rather than his cousin:

Well, first off, I just feared for myself and—not mainly for my cousin but for myself.   And I noticed it when it was sitting there.   When I got in the back seat at my cousin Jerry's house, I noticed [the gun] was there, so I just grabbed it and—I guess with the jerking movement it went off, sir.

Lozano also disputed that the three men had plans to buy marijuana that morning, stating, "That was news to me earlier when I heard [Owen testify]."   According to Lozano, they were only headed to drop off Jerry at the bus station that morning, and he was just "along for the ride."   Lozano, however, agreed with Owen's description of Jerry as the sole navigator that morning, stating Jerry provided the driving directions and was the one who instructed Owen to stop in front of Torres's house.   All of Lozano's statements at trial contradicted three previous statements he gave to police, where he maintained he

6

had only been to Torres's residence once several years ago and provided an alibi that was disproven by surveillance video recovered during the investigation.

The weapon used by Lozano was a 12-gauge shotgun, which belonged to Owen. Owen stated that he left it in his backseat after skeet shooting the day before. Expert testimony by the State and defense supported the assertion that the weapon and type of ammunition recovered are primarily used in skeet shooting.

The expert testimony, however, differed on the alleged distance between Torres and Lozano when the shooting occurred. The State's forensic pathologist, Elizabeth Miller, performed Torres's autopsy. Miller opined that Torres was shot two-to-three feet away, from a downward angle, based on the entry wound and trajectory of the pellets retrieved from inside Torres's body. Defense ballistics expert, Javier Espinoza, a National Rifle Association certified firearms instructor and manager at an indoor shooting range, disagreed with the State's findings. He testified that Torres was likely shot from two-to-three yards away. Espinoza based his expert opinion on photographs provided of Torres's injuries and the lack of residue and visible burns on Torres's body. Having analyzed the location of Torres's entry wound, the lack of pellets recovered, and the natural trajectory of pellets from a shotgun, Espinoza concluded the person who fired the weapon was also not likely aiming at Torres.

At the time of the shooting, Lozano was a three-time convicted felon and was not permitted to possess a firearm. During cross-examination of Lozano, the State introduced Lozano's robbery, aggravated assault with a deadly weapon, and felony possession of marijuana convictions. The jury returned a guilty verdict on one count of

7

murder, and the trial court pronounced punishment at forty-five years' imprisonment in the Texas Department of Criminal Justice, Institutional Division.

## II. EVIDENCE SUFFICIENCY

### A. Self-Defense and Defense of Third Party

In his first and second issues, Lozano argues the jury was irrational in rejecting Lozano's self-defense and defense of third party claims because the evidence was "legally insufficient to disprove" those theories. Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009). Here, a hypothetically correct jury charge would instruct the jury that Lozano was justified in using force against Torres "when and to the degree he reasonably believed the force was immediately necessary to protect himself" against Torres's use or attempted use of unlawful force. *See* TEX. PENAL CODE ANN. § 9.31(a) (West, Westlaw through 2017 1st C.S.).

Following a defendant's production of evidence raising a self-defense claim, the State has the "burden of persuasion to disprove the raised defense." TEX. PENAL CODE ANN. § 2.03(d); *id.* § 9.31 (providing for a self-defense claim). However, "[t]he burden of persuasion . . . requires only that the State prove its case beyond a reasonable doubt." *Zuliani v. State,* 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Moreover, a returned verdict of guilt by a jury is "an implicit finding against the defensive theory," and reviewing courts must defer to a jury's verdict, presuming the factfinder resolved any conflicting inferences in favor of the verdict. *Id.* at 594; *see also Braughton v. State*, No. PD-0907-17, 2018 WL 6626621, at *13 (Tex. Crim. App. Dec. 19, 2018). Jurors assess the credibility of the witnesses and evidence, and jurors are free to "accept one version of the

8

facts and reject another, and it may reject any part of a witness's testimony." *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018).

On review of a legal sufficiency challenge, this Court will consider the "combined and cumulative force of the evidence" in the light most favorable to the jury's verdict to "determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt." *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012) (citing *Jackson v. Virginia,* 443 U.S. 307, 318–19 (1979)).

In this case, the jury was presented with conflicting views of the events that lead to Torres's death. At trial, Lozano conceded his presence in the vehicle caught on surveillance passing Torres's home at the approximate time of the shooting, and he admitted to handling the shotgun. Lozano, however, disputed that he had any intent, premeditated or instantaneously-derived, to murder Torres.

Evidence was undisputed that Lozano spent a majority of the evening with Torres and Jerry, and that following Torres's departure, he remained with Jerry. Despite Lozano's constant proximity to Jerry, Lozano denied knowing whether Jerry had any continued contact with Torres via telephone. Lozano also minimized the existence of a relationship between Torres and himself, describing Torres as a friend of Jerry's—not his. Contrary to Lozano's categorization of his relationship with Torres, Lozano also testified that he had known Torres for years, he "often" referred to Torres as "little guy," and he was familiar with Torres's psychological state.

Lozano also stated that he knew where Torres lived, there were no alternate plans to go buy drugs that morning, and he knew Owen was driving in the opposite direction of

9

the bus station. Lozano testified he simply chose not to ask where they were going. Lozano stated he went along with Owen and Jerry "just for the ride," and he noticed the shotgun in the backseat of Owen's vehicle upon first entering the vehicle at Jerry's house.

Lozano maintained he acted in self-defense and in defense of a third party, when he accidentally discharged the shotgun. However, Lozano's position on whether he acted in defense of his cousin waivered during cross-examination: "Well, first off, I just feared for myself and—not mainly for my cousin but for myself." Lozano's testimony at trial also largely contravened his three prior statements made to law enforcement, where he repeatedly denied being at Torres's residence altogether that morning.

The State argued that it was unlikely that Lozano, who had already admitted to lying three times, was being wholly truthful at trial. The State reasoned that Lozano knew where Torres resided, and he sought Torres out in solidarity with his cousin Jerry, whom he knew was fighting with Torres. The State pointed to evidence which pitted a petite, mentally unstable man carrying a decorative sword and garden tool against two large men, under the protection of a larger vehicle. The location where Torres struck the vehicle, just below the front passenger window, provided evidence of Torres's comparatively diminutive position—as did the entry location of Torres's wound and the downward trajectory traveled by the pellets. This evidence, the State argued, contravened Lozano's position that he was in fear for his life when he acted in self-defense or defense of a third party.

Alternatively, the State argued that Lozano, a convicted felon, was in unlawful possession of a firearm when he chose to remain in the vehicle after he initially noticed

10

the shotgun. As a consequence, Lozano was engaged in criminal activity and any self-defense claim could not be presumed reasonable.

Giving proper deference to the jury's assessment of witness credibility at trial and the jury's verdict, we find the evidence legally sufficient to support the jury's findings. *See Febus*, 542 S.W.3d at 572; *see also Zuliani,* 97 S.W.3d at 594. We overrule Lozano's first and second issues.

## B. Sudden Passion

By his third issue, Lozano contends that under this set of facts, no rational jury could conclude that there was insufficient provocation to cause an ordinary person to be incapable of cool reflection. He asserts that the evidence was legally insufficient to support the jury's rejection of his claim of sudden passion.

At the punishment stage of a murder trial, a defendant may raise the issue of whether he caused the death of his victim under the "immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02(d). The Texas Penal Code defines "[s]udden passion" as "passion directly caused by and arising out of provocation by the individual killed . . . which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). "Adequate cause" is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). Sudden passion is a mitigating circumstance that, if found by the jury to have been proven by a preponderance of the evidence, reduces the offense from a first-degree felony to a second-degree felony. *Id.* § 19.02(d). Even if the evidence provided by the defendant "is weak, impeached, contradicted, or unbelievable," a defendant is nonetheless entitled to a sudden passion charge. *McKinney v. State*, 179

11

S.W.3d 565, 569 (Tex. Crim. App. 2005). "However, the evidence cannot be so weak, contested, or incredible that it could not support such a finding by a rational jury." *Id.*

Evidence of sudden passion was presented in the form of Lozano's testimony at trial. Lozano argued that he was under the immediate influence of terror after he witnessed Torres's "provocation" when Torres hit the front passenger vehicle door with his sword. Lozano testified that when he grabbed the shotgun to scare Torres, it accidently discharged. Lozano testified, "I thought he would get frightened by the sight of the rifle or something, but when he hit the truck, I just, I went like that, and it jerked, and it went off, sir."

In *McKinney v. State*, the defendant testified, like Lozano, "he thought the sight of the gun would scare [the victim] and that he did not intend to pull the trigger." *McKinney*, 179 S.W.3d. at 571. Although the defendant in *McKinney* did not attribute feelings of terror as a motivator for his actions, the Court determined McKinney's accidentally killing claim undermined his sudden passion defense. *Id.* The Court concluded the decision to grab a weapon with the intention of scaring the victim indicated a deliberate, methodical response to provocation. *Id.* Further, such a decision does not demonstrate a high level of terror rendering the mind incapable of cool reflection, as required for a sudden passion defense. *Id.* Additionally, despite Lozano's testimony that he was "frightened" of the victim, the jury was still free to reject his claim of sudden passion, as the jury could have rationally concluded that Lozano was not telling the truth. *See Febus*, 542 S.W.3d at 572. Lozano's third issue is overruled.

### III. ACCOMPLICE AS A MATTER OF FACT

In his fourth and seventh issues, Lozano contends the trial court erred by failing to instruct the jury that Owen was an accomplice as a matter of fact. Lozano argues that because Owen was an accomplice, the accomplice witness rule requires corroboration of the accomplice's testimony by other non-accomplice evidence to connect the defendant to the charged offense. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West, Westlaw through 2017 1st C.S.).

An erroneous or incomplete jury charge does not result in automatic reversal of a conviction. *See* TEX. CODE CRIM. PROC. ANN. art. 36.19; *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994) (en banc). Our review of alleged jury charge error involves a two-step process. *See Abdnor,* 871 S.W.2d at 731; *Farris v. State*, 506 S.W.3d 102, 108 (Tex. App.—Corpus Christi 2016, pet. ref'd). Initially, we determine whether error exists, and then determine whether harm resulted, with the level of harm analyzed contingent on a defendant's preservation of error. *Abdnor*, 871 S.W.2d at 731–32. We will search for "some harm" where a timely objection was made at trial. *Id.* By contrast, where the error is raised for the first time on appeal, we will search for "egregious harm." *Id.*

"When the evidence is uncontradicted or so one-sided that no reasonable juror could conclude that the witness was not an accomplice," a trial court has a duty to instruct the jury that a witness is an accomplice as a matter of law. *Ash v. State*, 533 S.W.3d 878, 886 (Tex. Crim. App. 2017) (outlining the factors to consider whether a witness is an accomplice as a matter of law). Whereas, "[i]f the evidence presented by the parties is conflicting and it is not clear whether the witness is an accomplice, then the trial court

13

must leave to the jury the question of whether the inculpatory witness is an accomplice witness as a matter of fact under instructions defining the term 'accomplice.'" *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004); *see Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011).

An "accomplice" is a person who "participates before, during, or after the commission of the crime with the requisite mental state." *Smith*, 332 S.W.3d at 454. "Mere presence at a crime scene does not make an individual an accomplice, nor is an individual an accomplice merely because he has knowledge about a crime and fails to disclose that knowledge." *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006)*; see Kunkle v. State*, 771 S.W.2d 435, 438–41 (Tex. Crim. App. 1986) (en banc) ("[T]here must be some evidence of an affirmative act by the witness committed to assist in commission of the offense before that witness may be considered an accomplice."). Finally, when the evidence clearly shows that a witness is not an accomplice, the trial judge is not obliged to instruct the jury on the accomplice witness rule—as a matter of law or fact. *Smith*, 332 S.W.3d at 440.

Lozano's claim regarding the State's lack of non-accomplice evidence corroboration rests upon whether the trial court correctly found that Owen was not entitled to an accomplice as a matter of fact instruction in the jury charge.[5] Apart from defense counsel labeling Owen an accomplice, no evidence in the trial record suggests Owen participated before, during, or after the commission of the murder with the requisite mental

---

[5] Charles Owen was initially charged with the same offense as Lozano. Prior to Lozano's trial, the State dismissed its case against Owen. Owen was subpoenaed to testify at Lozano's trial. At trial, Owen denied testifying as part of any agreement with the State and expressed reluctance to be testifying because he was related to Lozano. Any assertion that the State dismissed the charge against Owen in exchange for his testimony is unsupported by the record.

14

state—as an accomplice would be required to do. *See Smith*, 332 S.W.3d at 454. Lozano argues that the discrepancy in testimony regarding whether the men were planning to buy drugs together constitutes adverse evidence by an accomplice witness, requiring corroboration. However, Lozano complicates the accomplice determination analysis. For an accomplice instruction to be required, there must be conflicting evidence on the question of a witness's complicity in the offense at issue—not some ancillary uncharged offense. *See id.*; *see also Cocke*, 201 S.W.3d at 748.

Lozano's continued contention is that Torres's murder was accidental, in self-defense, and in no way premeditated. At no point did Lozano testify, even foregoing his own involvement, that Owen was complicit in Torres's murder. Owen testified that he drove Lozano and his cousin to Torres's neighborhood, planning to buy marijuana, at Jerry's instruction. Although Lozano disputed whether the purchase of marijuana was the reason for Owen's transportation, there was no evidence that suggested Owen transported Lozano and Jerry to Torres's residence for the purpose of murdering or even coming into contact with Torres, nor was there any evidence presented that Owen assisted Lozano in any manner during the shooting. Owen and Lozano both testified that, following the shooting, Owen immediately drove away on his own accord. Thus, there exists no evidence to raise a fact question regarding whether Owen was an accomplice to Torres's murder since mere presence during a crime is insufficient. *See Cocke*, 201 S.W.3d at 748. Lozano's fourth issue is overruled.

In his seventh issue, Lozano argues the evidence is insufficient to sustain his conviction because there was no corroboration of the accomplice witness's testimony. Since we have determined that the trial court was correct in its finding that Owen was not

15

an accomplice witness as a matter of fact, no corroboration of his testimony was necessary. We conclude that his testimony, along with the other evidence adduced at trial, was sufficient to support the conviction. Lozano's seventh issue is overruled.

## IV. SELF-DEFENSE LIMITATIONS

In his fifth and eighth issues, Lozano argues that the trial court erroneously instructed the jury on the doctrine of provocation, thereby limiting his self-defense claim. The trial court charged the jury on the law of murder, on the lesser included offense of manslaughter, and on the law of self-defense and defense of third parties.

A defendant is entitled to an instruction on any defensive issue raised by the evidence, whether that evidence is "weak or strong, unimpeached or contradicted, and regardless of the trial court's opinion about the credibility of the defense." *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999); *see Walters v. State*, 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007). The trial court shall "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case[,] not expressing any opinion regarding the weight of the evidence . . . ." TEX. CODE CRIM. PROC. ANN. art. 36.14.

With certain exceptions not applicable here, the self-defense provision of the penal code reads as follows:

> (a) [A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. The actor's belief that the force was immediately necessary as described by this subsection is presumed to be reasonable if the actor:
>
>> (1) knew or had reason to believe that the person against whom the force was used:
>>
>>> (A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;

16

. . . .

    (2)  did not provoke the person against whom the force was used; and

    (3)  was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

(e)  A person who has a right to be present at the location where the force is used, who has not provoked the person against whom the force is used, and who is not engaged in criminal activity at the time the force is used is not required to retreat before using force as described by this section.

TEX. PENAL CODE ANN. § 9.31(a)(1)(A), (a)(2), (a)(3), (e). The jury charge in this case recited the above portions of the self-defense statute verbatim.

Acting as a "limitation or total bar on a defendant's right to self-defense" is the doctrine of provocation or provoking the difficulty. *Smith v. State*, 965 S.W.2d 509, 513 (Tex. Crim. App. 1998) (en banc). The doctrine of provocation is codified in section 9.31(b)(4) of the Texas Penal Code:

(b)  The use of force against another is not justified . . .

    (4)  if the actor provoked the other's use or attempted use of unlawful force, unless:

        (A) the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter; and

        (B) the other nevertheless continues or attempts to use unlawful force against the actor . . . .

*Id.* § 9.31(b)(4). However, the codified language required for a "provoking the difficulty" instruction is entirely absent from the jury charge at issue here. Accordingly, Lozano's fifth and eighth issues are overruled.

17

In Lozano's sixth issue, he similarly argues the trial court erred in denying his request for an unqualified instruction on self-defense, namely, by permitting "criminal activity" language.[6]   As previously established, the language in the jury charge at issue, including the phrase "criminal activity", is taken verbatim from the self-defense statute, § 9.31(a)(1)(A), (2), (3) and 9.31(e).   Lozano cites no authority in support of his argument that the court erred in submitting the statutory language, and this Court is unable to find any.   The error Lozano complains of is not present.   Lozano's sixth issue is overruled.

## V.   MOTION FOR NEW TRIAL

The Texas Code of Criminal Procedure provides "a new trial shall be granted where material evidence favorable to the accused has been discovered since trial."   TEX. CODE CRIM. PROC. ANN. art. 40.001 (West, Westlaw through 2017 1st C.S.).   However, to obtain relief under the provision:

> the defendant must satisfy the following four-prong test:   (1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial; (2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial.

*State v. Arizmendi*, 519 S.W.3d 143, 149 (Tex. Crim. App. 2017).

In his motion for new trial, timely filed on November 23, 2015, Lozano alleged:   (1) juror misconduct; (2) newly discovered evidence, namely, that the residence across from Torres's home belonged to a Brownsville Police Officer; and (3) the State's presentation

---

[6] Despite Lozano's claims on appeal, Lozano's trial counsel did not object to the jury instructions with respect to the inclusion of "criminal activity" language in the self-defense portion of the charge.   During the charge conference, the State initially objected to the admittance of the self-defense instruction, arguing that defendant's alleged criminal activity precluded the jury from receiving the self-defense instruction altogether.   Ultimately, both parties agreed to include the proposed self-defense instruction in its entirety— including section 9.31(a)(3), so the jury could make the criminal activity determination themselves.

18

of Owen's "perjured" testimony violated Lozano's constitutional right to due process.   On December 14, 2015, Lozano filed an amended motion for new trial, raising issues not presented in his original motion for new trial.   The State objected to the untimeliness of the amended motion.[7]   On January 6, 2016, following a hearing, the trial court denied Lozano's motion for new trial.

In his ninth and final issue, Lozano argues the trial court abused its discretion in denying his motion for new trial because there existed newly discovered evidence.   His entire argument on appeal is as follows:

> [T]he uncontroverted evidence showed that the evidence of accomplice Charles Owen [sic] that Charles Owen and Kevin Lozano were involved in a dope deal across the street at about the same time as the shooting was simply false.   The defendant's investigator testified without rebuttal or contradiction that the people across the street were a policeman and his retired parents and that all the other people across the street for the whole block did not even know Kevin Lozano or Charles Owen.

Lozano's two conclusory sentences alleging newly discovered evidence lack citation to the record and are without additional discussion or analysis of legal authority. *Black v. State*, 551 S.W.3d 819, 831 (Tex. App.—Corpus Christi 2018, no pet.); *Garza v. State*, 290 S.W.3d 489, 491 (Tex. App.—Corpus Christi 2009, pet. ref'd); TEX. R. APP. P. 38.1(h) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").   A claim which is inadequately briefed is subject to rejection on that ground alone.   *See Castillo v. State*, 810 S.W.2d 180, 182 (Tex. Crim. App. 1990).   We overrule Lozano's ninth issue.

---

[7] Texas Rule of Appellate Procedure 21.4(b) prohibits a defendant from filing an amended motion for new trial after the thirty-day period prescribed, even with leave of court.   *State v. Moore,* 225 S.W.3d 556, 558 (Tex. Crim. App. 2007).   However, such prohibition does not "deprive trial court of authority to rule on tardy amendment to timely motion for new trial" if the State does not object.   *Id.*

## VI. CONCLUSION

We affirm the judgment of the trial court.

GREGORY T. PERKES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
2nd day of May, 2019.