# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00393-CR

---

### Donald Edward Little, Appellant

### v.

### The State of Texas, Appellee

---

### FROM THE 51ST DISTRICT COURT OF IRION COUNTY
### NO. CR21-002, THE HONORABLE LEE HAMILTON, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Donald Edward Little was convicted of misapplication of fiduciary property totaling more than $30,000 but less than $150,000 and was sentenced to five years' imprisonment. *See* Tex. Penal Code §§ 12.34, 32.45. In five issues on appeal, he contends that the evidence is insufficient to support his conviction and that the trial court erred by allowing the State to amend the indictment. We will affirm the trial court's judgment of conviction.

## BACKGROUND

In 1996, articles of incorporation were filed with the Office of the Secretary of State forming the Barnhart Water Supply Corporation (BWSC) to provide water services to individuals residing in and around Barnhart, Texas. The BWSC's original bylaws specified that the board of directors would consist of three directors: a president, a vice president, and a secretary-treasurer. The bylaws stated that the BWSC members would elect the directors at the

members' regular meeting, that the directors would not be paid for their services but could be compensated for actual expenses by a majority vote of the directors, and that checks from BWSC's account had to be signed by two directors: the secretary-treasurer and either the president or the vice-president. Additionally, the bylaws specified that anyone owning property or having a legal right to possess or occupy property in the area covered by BWSC "shall have the right to become a Member of the Corporation upon payment of the Membership fee" of $100, entitling the applicant to a connection to the BWSC system. Further, the board of directors could determine the form of the membership certificates, and ownership of memberships "are deemed to be vested in those persons who are the record owners of Memberships." Additionally, the bylaws specified that they could be altered or amended by a majority vote of the members but could not be amended in a manner that deprives any member "of rights and privileges then existing."

In 2017, the three longstanding directors of the BWSC board—Bill Avery (president), John Nanny (vice president), and Frances Shaw (secretary-treasurer)—wanted to transfer the operation of BWSC to a new board. Michael Barron expressed interest in the opportunity. According to the minutes from the board's meeting in April 2017, Barron presented a letter of intent to acquire the assets of BWSC, and the board accepted the letter of intent and scheduled an agenda item to discuss the letter at the next meeting in May 2017. Barron attended that meeting with his lawyer Little and Ned Smith. After that meeting, Barron, Little, and Smith took over the operations for BWSC.

Shortly after the meeting, Little prepared amended bylaws for BWSC naming the following individuals to the board of directors: Barron (president and treasurer), Smith (vice president), and Little (secretary). The amended bylaws specified that checks or other payment

2

instruments may be authorized by the signature of the president, the secretary, or another officer authorized by the amended bylaws and no longer required signatures from two officers. Further, the amended bylaws empowered the board of directors to make future amendments to the bylaws or to adopt new ones by a majority vote of the directors. Similar to the previous bylaws, the amended bylaws stated that the purpose of the nonprofit corporation is "to provide water services and services ancillary to the provision of water" in Barnhart.

While serving as president of BWSC, Barron purchased a backhoe with his personal funds. After purchasing the backhoe, Barron tried to sell it by placing it in the parking lot of a business that he owned with a for sale sign on it. On August 28, 2019, Barron sent an email to the bookkeeper for BWSC, Nola Baumann, asking her to call him when she received the email. Barron attached to the email a bill of sale for the backhoe stating that BWSC was going to purchase the backhoe from him for $28,500. When Baumann talked with Barron, he asked her to write a check to him from BWSC's bank account for $28,500. Baumann refused, explaining that she believed that the residents of Barnhart had to vote to approve that type of acquisition. Baumann called residents in the community to see if they knew anything about the proposed sale, but none of the residents had heard about it.

Two days later, Little emailed Baumann, informing her that she had been fired from her position and demanding that she hand over all records for BWSC. The email also stated that BWSC only has three members, that all BWSC assets and authority over those assets were transferred to the board of directors in 2018, and that the residents of Barnhart "do not have any ownership interests in" BWSC. Little sent a follow-up email the following day stating that if Baumann did not return all the records, he would "act accordingly to obtain the property and

3

records." An employee for BWSC's bank called Baumann to inform her that Barron had taken the money from the account.

After Baumann was fired, a meeting was scheduled for October 28, 2019, between the new board of directors and the customers of BWSC, who were Barnhart residents. The former directors attended the meeting, and the meeting was recorded. During the meeting, Little told the crowd multiple times that the former board "sold your rights" away and told the crowd that no one at the meeting other than Barron, Little, and Smith was a member of BWSC because no one besides the three of them had membership certificates. At the meeting, Little handed out copies of a document entitled "Unanimous Resolution of the Members of Barnhart Water Supply Corporation," which he stated had been signed by all three former directors. The unanimous resolution was dated May 3, 2017, and specified that the former directors resigned their positions and appointed Barron, Little, and Smith "as sole Members of Barnhart Water Supply Corporation" "with all rights and privileges . . . , including but not limited to transfer of all assets, bank accounts, [and] certificates of deposit." The unanimous resolution also purported to indemnify the former directors for any liabilities incurred related to their service, contained the former director's signatures, and specified that the former directors were "all [of] the Members of the Barnhart Water Supply Corporation."

At the meeting, former directors Nanny and Shaw both denied signing the document that Little handed out. Further, another resident asserted that Little was just "lining his pockets," and Little responded by saying that "[w]e're lining our pockets, yeah." Little and Barron then left the meeting, and Little stated that the dispute would be resolved in court.

Following that meeting, a group of residents of Barnhart sought a temporary and permanent injunction against Barron and Little preventing them from selling any assets,

4

collecting any money due, and writing checks on BWSC's corporate account. The residents also filed a petition to remove Barron and Little as directors of BWSC, asserting that Barron and Little improperly made large financial expenditures of BWSC's money without approval by the members, paid themselves with BWSC's money, and amended BWSC's bylaws to deprive members of their rights and privileges. Contemporaneously, Barron filed suit against several residents of Barnhart, asserting that he was fraudulently induced into becoming a director and operating BWSC, that the residents improperly converted BWSC property, and that the former directors breached the terms of the unanimous resolution. Barron was represented by Little in both suits. A few months later, the parties filed an agreed motion to dismiss both cases after entering into a settlement agreement. Under the settlement agreement, the parties agreed to the following: BWSC would retain ownership of the backhoe; the parties agreed not to pursue any claims of fraud or perjury or any further legal actions with the Attorney General, the Texas Rangers, and the Texas Commission on Environmental Quality; and Baron agreed that he would no longer attend any BWSC meeting.

Approximately one year later, Little was indicted for misapplication of fiduciary property belonging to BWSC by receiving personal payments from BWSC that were not in conformity with BWSC's purposes. An attachment to the indictment listed five specific checks serving as the basis for the charge. During the trial, the following individuals testified for the State: Pete Barrera, who was the current president of BWSC; Smith, who was the vice president of and director for BWSC when Barron and Little were also officers and directors; Baumann, who was the bookkeeper for BWSC before she was fired by Little; Glenda Kuykendall, who was the secretary for BWSC at the time of trial; Jeffrey Lisson, who was the attorney that previously represented Nanny and testified as an expert on nonprofit corporations; Susan Downman, who

was an auditor working for the Attorney General's Office in the Criminal Investigations Division; and Greg Dickerman, who was an investigator working for the Attorney General's Office in the Criminal Investigations Division. When presenting his case, Little elected to testify and called several witnesses including the following: former directors Avery, Nanny, and Shaw who, respectively, were the president, vice president, and secretary-treasurer of BWSC for years before Barron and Little took over operating BWSC; Barron, who took over operating BWSC with Little; and Bart Baggett, who testified as a handwriting expert.

In addition, multiple exhibits were admitted into evidence, including copies of various checks, bank records from several accounts, the unanimous resolution, a recording of the meeting where Little passed out the unanimous resolution, BWSC's articles of incorporation, BWSC's bylaws and amended bylaws, the minutes of the board meeting from April 2017, a copy of an indictment from January 2019 against Barron for aggravated assault with a deadly weapon, a copy of a notice of appearance of counsel filed by Little on behalf of Barron in the aggravated-assault proceeding, paperwork from the civil suits filed by the residents and by Barron, the settlement agreement and order dismissing the two civil suits, an application for service from BWSC filed by Barrera, the bill of sale sent to Baumann, the email sent to Baumann stating that Little had fired her, a membership certificate issued to Barron in May 2017 and signed by Little, and an invoice of services prepared by Little setting out legal work that he asserted he performed from November 2019 to February 2020.

Regarding the checks forming the basis for the indictment, copies of the following checks were admitted as exhibits:

> A check from BWSC's account dated September 5, 2019, that was made out to
> Barron for $28,500 and contained in the memo line a remark that the check was

6

for reimbursement for the backhoe.

A check from Barron's personal account dated September 5, 2019, that was made out to Little for $28,500 and listed in the memo line that the check was for attorney's fees.

A check from BWSC's bank account dated October 29, 2019, that was made out to Little for $5,000, signed by Barron, and specified in the memo line that the check was for "Attorney At Law October 29 Litigation."

A cashier's check from BWSC's account dated November 1, 2019, that was made out to Barron for $10,000 and had Barron's and Little's signatures on the endorsement side of the check.

A check from BWSC's account dated December 9, 2019, that was made out to Little for $1,000, signed by Barron, and did not list anything in the memo line.

At trial, Lisson testified as an expert on nonprofit corporations. In his testimony, Lisson explained that water supply corporations are nonprofit corporations. Further, he related that members of nonprofit corporations do not receive salaries but that employees may be paid a salary. Next, he stated that a director or officer can be paid reasonable rates for providing services to a nonprofit corporation; however, he related that any distribution made would have to be used for purposes benefitting the people who obtain services from the nonprofit corporation. Additionally, he testified that nonprofits are designed to serve the people that benefit from its operations, that a water supply corporation's assets must be used solely for the benefit of the corporation and its members and cannot be used to benefit third parties, and that anyone who gets service from a water supply corporation "is a member of that corporation." He explained that nonprofit corporations may not make a profit and that no one is supposed to make money from a water supply corporation. Moreover, he stated that only members of a water supply corporation can serve on the board of directors, meaning that individuals on the board must receive water service from the corporation. Next, Lisson explained that individuals on the board

7

and officers are fiduciaries to a water supply corporation and its members and must put the corporation's and the members' needs ahead of their own. Regarding BWSC, Lisson testified that BWSC was designed to benefit its members, who are the people obtaining water service from BWSC, including renters and property owners; that the board of directors could not own BWSC; and that the original bylaws did not authorize cancelling anyone's membership status. *See* Tex. Water Code § 67.016(e) (limiting circumstances in which corporation may cancel membership to those where person fails to meet conditions for water service or comply with condition placed on receipt of water).

Concerning the transfer of BWSC's operations to Barron, Little, and Smith, Lisson testified that the unanimous resolution was not proper because the transfer of all or substantially all of the assets requires approval by the members, rather than the board, at a meeting with proper notice. Further, he stated that Little could not serve on the board because he did not receive services from BWSC. *See id.* § 67.0051 (providing that to be qualified to be director, person must be member of corporation). Similarly, Lisson explained that the proposed amendments to the bylaws were not properly adopted because amendments require a vote by the members at a meeting and because the amendments were inconsistent with the directive from the original bylaws specifying that a resident's membership could not be taken away.

During his cross-examination, Lisson explained that water supply corporations could hire an attorney and pay attorney's fees if the services provided by the attorney were for the benefit of the nonprofit and its mission. However, on redirect, Lisson testified that a lawyer seeking to be paid by a nonprofit should sign a retainer agreement showing that the lawyer's services were for the purpose of the nonprofit and setting out the terms of the representation, fees, and scope of what the lawyer would do. Further, he related that any payment would need

8

approval by the board of directors, that an individual getting paid should not be part of the approval vote if he or she is on the board due to the conflict of interest, and that there would need to be a record of the approval vote in the organization's records.

The auditor for the Criminal Investigation Division of the Attorney General's Office, Downman, testified regarding the forensic audit that she performed in this case. Specifically, Downman related that she looked at three accounts for BWSC, one personal account for Barron, and one business account for Barron. Regarding BWSC's accounts, Downman related that BWSC received money almost exclusively from its customers' water bills and that typically the expenditures went to plumbing vendors, maintenance expenses, water testing vendors, and payments to the bookkeeper; however, Downman explained that there were payments to Barron and Little that did not appear to be related to BWSC's purpose and that the total amount of misapplied funds that Little received was $44,500 belonging to BWSC.

Downman related that the first unusual check was a check from BWSC's account dated September 5, 2019, that was made out to Barron for $28,500; was authorized by Barron without another signatory; and indicated that it was reimbursement for the backhoe. The second check was from Barron's account, had the same date as the previous check, was made out to Little for the same amount as the previous check, and noted that the amount was for attorney's fees. Downman explained that she was unaware of any business or legal events involving BWSC occurring at that time; however, she explained that Little had represented Barron during a criminal case starting in March 2019 and that Barron's account had not been used to pay Little from January to August of 2019. The third check was from BWSC's account, was dated October 29, 2019; was made to Little for $5,000; was authorized by Barron without any other signatory; and indicated that the money was for the October 29 litigation. The fourth was a cashier's check

9

dated November 1, 2019, for $10,000 from BWSC's account, was made out to Barron, and had Barron's and Little's signatures on the endorsement line. In addition, the withdrawal slip showed that the only authorizing signature for that transaction was Barron's signature. The final check was from BWSC's account; was dated December 9, 2019; was made to Little for $1,000; and did not mention what the money was for in the memo line.

The investigator in the Criminal Investigations Division of the Attorney General's Office, Dickerman, testified regarding his investigation after the case was referred to the Attorney General from the Irion County Sheriff's Office in March 2020. In his testimony, Dickerman related that his review of BWSC's articles of incorporation and bylaws indicated that the board of directors must be elected by the members of the water supply corporation at an annual meeting. Further, he related that the directors must be members of the water supply corporation and that the bylaws required that the person receive service from BWSC, meaning that the individual must have paid the application fee for a water meter. Along those lines, he explained that someone becomes a member by applying and paying for a water meter to receive service from BWSC. Moreover, he stated that BWSC could not rescind an individual's membership or take away voting rights, that BWSC's bylaws could only be amended by a vote of the members and could not be amended to deprive any members of their rights, and that the new bylaws did not reflect that they were presented and approved by the members and instead state that they were approved by the board of directors. Regarding the amended bylaws, he testified that they gave Barron the authority to write checks without another signatory. Further, he related that although the unanimous resolution stated that the only three members of BWSC were Avery, Nanny, and Shaw, there were other members as well. Although he acknowledged that BWSC started collecting more money from the residents after Barron took over, Dickerman

10

explained that charging members more simply to increase BWSC's revenue was not consistent with BWSC's purpose.

Regarding the financial transactions alleged in this case, Dickerman related that in September 2019 the funds from BWSC's corporate account were removed and transferred to another bank. Moreover, Dickerman discussed the checks mentioned above and explained that Barron's accounts would not have had sufficient funds to cover the $28,500 check written to Little if Barron had not deposited the $28,500 from BWSC. Additionally, Dickerman explained that the $10,000 cashier's check endorsed by Barron and Little was written on the day after the residents filed a civil suit seeking to have Barron and Little removed from the board and that the $5,000 check to Little from BWSC's account was also written about when the residents initiated the civil suit. Dickerman also testified about other checks written by Barron to Little around the time of legally significant events. For example, Dickerman stated that Barron wrote Little a check for $3,000 on April 18, 2017, with a memo indicating that the check was for "water," and the date of the check is about when Barron presented his letter of intent to the former board. Similarly, Dickerman testified that Barron wrote Little a check for $12,500 on May 3, 2017, with a memo stating that the check was for "BWSC," and the date of the check is the same as the date appearing on the Unanimous Resolution drafted by Little and the date of the meeting in which the former board purportedly agreed to transfer operations to Barron, Little, and Smith. Along those lines, Dickerman related that Barron wrote a check to Little for $15,000 on October 19, 2018, stating that it was for "legal" work, and Dickerman explained that the amended bylaws were adopted by Barron and Little on the same date listed on this check.

The current president of BWSC, Barrera, testified that he never saw the unanimous resolution, that Barron put extra meters on the residents' property and charged the

11

residents for those extra meters, that Little was trying to increase the price of water for his own benefit, that Little informed residents at the October 2019 meeting that they were no longer members of BWSC, that the residents had to sue to regain control of BWSC, and that most of the funds from BWSC had been depleted when he took over as president. Regarding the backhoe, Barrera explained that Barron used BWSC money to buy the backhoe even though he did not check with the members, that BWSC had no need for the equipment because it rarely uses that type of equipment and can just rent the equipment if needed or ask to use equipment belonging to one if its members, that BWSC did not have a place to store the equipment, and that BWSC ultimately sold the backhoe for $24,000. Concerning BWSC, Barrera related that the application fees or deposits that residents paid to get water service were considered their membership fees.

Smith, who was the other new director on the board with Barron and Little, testified that he had been a member of BWSC before becoming vice president because he paid for a water meter, that anyone who had a meter was a member, that Barron and Little never mentioned that the three of them would be the only members after the transfer, and that he had not intended to take anyone's membership away and instead wanted to volunteer to help maintain BWSC's water supply. Further, Smith related that he retired after Barron and Little fired Baumann, that Barron used his position with BWSC "as a way to make money" rather than "take care of the community," and that Barron and Little told the community in the October 2019 meeting that the community no longer had any control over what BWSC did. Regarding the backhoe, Smith said that Barron purchased the backhoe and used it on his personal property, that the backhoe cost $24,000 plus shipping, and that Barron did use the backhoe to clean alleyways for BWSC. Concerning the May 2017 meeting where Barron, Little, and he became board members, Smith explained that he saw the former board of directors sign a document but did

12

not know what the document was. During his cross-examination, Smith stated that the new water meters more accurately measured water consumption.

Next, Baumann testified that she served as the bookkeeper for BWSC for more than twenty years, that individuals automatically became members of BWSC by filling out an application and paying a deposit for water service, that everyone with a water meter was a member, and that BWSC was formed to benefit the citizens of Barnhart. Further, Baumann explained that the original bylaws required two of the officers to sign checks. Additionally, Baumann related that she was fired after Barron asked her to write him a check for the backhoe for an amount Barron believed the backhoe was worth, that she refused because that type of purchase had to be approved by the members, that Barron stated that he needed the money to pay for back surgery, and that Little sent her an email explaining that two directors—Barron and him—had authorized the purchase. Regarding the backhoe, Baumann said that she called someone who sells backhoes and that the individual explained that the backhoe was not worth as much as what Barron suggested. Furthermore, Baumann explained that the bill of sale did not provide enough information to ascertain the condition or value of the backhoe for several reasons, including by not disclosing the model year or hours used. Moreover, Baumann stated that BWSC did not need a backhoe because residents in Barnhart would donate their time and their equipment for BWSC projects that came up, that there had only been two or three times that equipment had been needed for repairs, and that BWSC had no place to store the backhoe.

Concerning the civil lawsuits, Baumann testified that under the settlement, membership was transferred back to the residents, and Barron and Little were required to return all BWSC records. Baumann also related that she currently volunteers to help BWSC and the current bookkeeper and that her review of the records revealed the checks written to Little;

13

however, Baumann explained that she did not find any invoices or other documents showing that Little had performed any legal work for BWSC.

Following Baumann's testimony, the current secretary for BWSC, Kuykendall, testified that the only income BWSC received was from the water bills sent to residents. Regarding BWSC's records, Kuykendall explained that there were no invoices for legal services provided to BWSC by Little and no letter specifying that he would represent BWSC for any particular fee.

When presenting his defense, Little called the former president of BWSC, Avery, who testified that he wanted someone else to take over running BWSC; that Barron was interested in the opportunity; that all of the members agreed in April 2017 to allow Barron, Little, and Smith to take over; and that he told Little that all the members agreed to allow them to take over and voted on it. However, Avery noted that the unanimous resolution incorrectly stated that there were only three members and that Little added words like "sole members" when drafting the resolution even though that was not true. Further, Avery stated that the unanimous resolution was not presented to the members and was instead shown to the board of directors. Moreover, Avery related that Little stated it was necessary for the board of directors to sign the resolution to protect themselves from future liability, that he did not understand the resolution when he signed it, that the former board of directors did not read the full resolution, and that he was not sure if Nanny or Shaw signed the document.

Following Avery's testimony, the former vice president of BWSC, Nanny, testified that he signed something in Little's presence but does not remember signing the unanimous resolution; on the contrary, Nanny explained that the only document he remembered signing was an indemnification clause that was worded differently from the unanimous

14

resolution. Similarly, the other former board member, Shaw, testified that she did not sign the unanimous resolution. Further, Nanny stated that Little did not give the board copies of the documents. Additionally, Nanny related that there were more than three members of BWSC, that BWSC was owned by the thirty to forty users who paid for a meter, and that he only intended to transfer operation of BWSC to a new board. Regarding the signatures on the resolution, Little's handwriting expert, Baggett, testified that after he examined known signatures for Nanny and Shaw and compared them with the signatures on the resolution, he concluded that Nanny and Shaw both signed the resolution.

Next, Little called Barron as a witness, and Barron testified that Little has represented him in three prior cases, including his divorce and his criminal case. Regarding BWSC, Barron explained that Little drafted a letter of intent stating that Barron wanted to acquire BWSC's assets and that Avery signed the letter at the April 2017 meeting when the board of directors voted to accept the letter of intent. Further, Barron stated that all of the directors signed the unanimous resolution, that the three directors were the only members, that Avery said that he checked with the residents and that they all approved of the resolution, and that the resolution appointed Little, Smith, and him as the sole members. Barron testified that when he looked through BWSC's records, he did not find any membership certificates for the residents and that without certificates, the residents could not have been members; however, Barron explained that he had a membership certificate. Additionally, Barron said that he received no compensation for operating BWSC other than reimbursements for his expenses; on the contrary, Barron stated that he invested $100,000 in BWSC that he paid from his $610,000 divorce settlement and that he spent "quite a bit" of his money buying supplies for BWSC without reimbursement. Regarding the backhoe, Barron stated that he purchased it to replace all

15

the meters with new ones to stop the water loss that was happening each month, that BWSC needed the equipment, that he decided to sell the backhoe to BWSC because he used it for the benefit of BWSC, and that BWSC later sold the backhoe for $24,000. Moreover, Barron testified that BWSC's yearly revenue doubled after he took over. Barron also stated that he believed that the former board had the authority to adopt the unanimous resolution.

In his testimony, Barron stated that he hired Little for the two civil lawsuits involving BWSC but that Little was not fully paid for his services. Barron went over an invoice setting out that Little was owed approximately $52,000 in fees and had a little over $6,000 in costs from November 2019 to February 2020 stemming from his representation in the two lawsuits. Further, Barron explained that he paid Little $16,000 for reasonable attorney's fees and withdrew the money from BWSC's account between October 2019 and mid-December 2019 but could not pay Little the full amount owed because a preliminary injunction stopped him from writing any more checks.

During his cross-examination, Barron agreed that the old bylaws required two signatures on checks but that the amended bylaws got rid of that requirement and that as a fiduciary, he could only expend money from BWSC's accounts for the benefit of BWSC. Further, Barron agreed that the articles of incorporation stated that individuals having property served by BWSC have the right to become members by paying a fee. Additionally, Barron stated that he was obligated to return all BWSC records and did so. Barron related that he previously paid Little out of his personal bank account for legal services regarding researching BWSC ($3,000), preparing the unanimous resolution ($12,500), preparing the bill of sale ($4,000), and drafting the amended bylaws and handling his divorce ($15,000), and Barron explained that the payments were typically made at the time the legal services were provided.

When discussing Little representing him in his aggravated-assault case, Barron stated that he did not pay Little for representing him in that case until September 2019 even though he was indicted in January 2019 and even though Little informed the trial court that he was representing Barron in March 2019.

Barron testified that he wrote himself a check for $28,500 from BWSC's accounts and that he needed the money at the time for back surgery, but he later stated that he needed the money to pay attorney's fees and fees for an investigator and that he wrote Little a check for the same amount for attorney's fees associated with BWSC. Barron also admitted that the funds may have been compensation for Little representing him in the aggravated-assault case because there were no legal matters related to BWSC occurring then. Concerning the $10,000 cashier's check withdrawn from BWSC's account in November 2019, Barron said that the check was endorsed by Little and him and that the check was "[p]robably for lawyer fees," but Barron admitted that he could not tell if the check was written for the benefit of the members of BWSC. When asked about the $5,000 check to Little from BWSC's account from October 2019, Barron stated that the check was for attorney's fees to defend him in the lawsuit filed by the residents. Similarly, Barron stated that the $1,000 check to Little written in December 2019 and withdrawn from BWSC's account was for attorney's fees for defending against the lawsuit filed by the residents. Barron testified that he returned all the records pertaining to BWSC that were in his possession.

During the trial, Little elected to testify and explained during his testimony that Avery, Nanny, and Shaw all signed the resolution, that the bylaws in effect required individuals to have certificates to be members, that the board of directors stated that they were the only members, and that he relied on and believed that representation when he wrote the unanimous

17

resolution. Further, Little related that Barron, Little, and Smith obtained membership certificates in May 2017 and that he created the certificates as secretary for BWSC. Regarding the checks written to him from BWSC's account, Little testified that the total amount was $16,000, that he incurred over $6,000 in costs while representing BWSC, and that he was owed $55,000 in reasonable fees for working 131 hours performing legal work. Moreover, Little related that any payments that Barron made were for the benefit of BWSC.

In his cross-examination, Little admitted that he understood from the beginning that BWSC was a nonprofit corporation. Although Little acknowledged that he owed a fiduciary duty to the members of BWSC by becoming a director and an officer, he asserted that the only members were Barron, Smith, and him. Little testified that he was able to be a member of BWSC because he handled Barron's properties in the area. Regarding the transfer of BWSC in 2017, Little stated that no members were denied any rights or privileges because no resident had completed the steps necessary to become a member by obtaining a membership certificate. Little stated that he made copies of the BWSC's records but returned them to BWSC. Little admitted that he drafted the bill of sale for the backhoe, that he received the $28,500 payment, and that he endorsed the $10,000 cashier's check from BWSC. Regarding the payments that were made by BWSC, Little explained that only a majority of the board had to approve the transactions, that a majority approved all of the expenditures, and that it did not matter if one or more of the directors were interested parties in the transactions.

After considering the evidence, the jury convicted Little of misapplication of fiduciary property. Little appeals his conviction.

18

**DISCUSSION**

In his first four issues on appeal, Little challenges the sufficiency of the evidence supporting his conviction. Specifically, Little asserts that there was insufficient evidence to establish that BWSC was at a substantial risk of losing at least $30,000, that the $16,000 payment to him from BWSC's account constituted criminal conduct, that he acted on his own or as a party to the offense with the requisite intent to commit an offense, and that he misapplied currency as alleged in the indictment. In his final issue, he contends that the trial court erred by allowing the State to amend the indictment. Because his first three issues present related arguments, we will address those issues together before addressing the remaining issues.

**Sufficiency of the Evidence**

*Evidence Concerning Misapplied Property and Intent*

"Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In making this determination, "[w]e view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Id.* "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id.* "Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *id.*, and are "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence," *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.— Houston [14th Dist.] 2006, pet. ref'd). "When the record supports conflicting inferences, we

presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Appellate courts also must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Id.* at 107 (quoting *Jackson*, 443 U.S. at 320).

Under the Penal Code, a person commits the offense of misapplication of fiduciary property if the person "intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary . . . in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held." Tex. Penal Code § 32.45(b). The term "[f]iduciary" includes "an officer, manager, employee, or agent carrying on fiduciary functions on behalf of a fiduciary." *Id.* § 32.45(a)(1); *see also Southwest Livestock & Trucking Co. v. Dooley*, 884 S.W.2d 805, 809 (Tex. App.—San Antonio 1994, writ denied) (explaining that "[c]orporate officers and directors" have fiduciary relationship with corporation). In this context, the term "'[m]isapply' means deal with property contrary to: (A) an agreement under which the fiduciary holds the property; or (B) a law prescribing the custody or disposition of the property." Tex. Penal Code § 32.45(a)(2). Further, under the Business Organizations Code, a

20

director, officer, or member of a nonprofit may not receive payment from the corporation's income but may receive payment for services provided to the corporation. Tex. Bus. Orgs. Code §§ 22.053-.054.

Moreover, as specified in the jury charge in this case, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both," Tex. Penal Code § 7.01, and "[a] person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense," *id.* § 7.02(a)(2). "To prove the intent-to-promote-or-assist element, the State must show that it was the defendant's conscious objective or desire for the primary actor to commit the crime." *Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020). When reviewing the record for evidence of intent, appellate courts look to events occurring before, during, or after the offense. *Id.*

The indictment in this case alleged that from October 18, 2018, and continuing to December 16, 2019, Little, "pursuant to one scheme and continuing course of conduct," "intentionally, knowingly, and recklessly" misapplied United States currency "of the value of $30,000 or more but less than $150,000" that he "held as a fiduciary" contrary to provisions of the Business Organization Code governing disposition of that property "and in a manner that involved substantial risk of loss to the members of the Barnhart Water Supply Corporation, the owners of the property, and the persons for whose benefit the property was held, by making and receiving personal payments with said United States currency, not in conformity with the corporation's purposes." Further, the indictment listed the payments made or received as follows:

21

| Institution | Acct | Date | Ref | Payee | Description | Credit | Debit | Memo Line | Signatory |
|---|---|---|---|---|---|---|---|---|---|
| Wells Fargo | xxxx | 9/5/2019 | xxxx | Barron | check deposit | 28,500.00 | | Reimbursement for backhoe | |
| Wells Fargo | xxxx | 9/5/2019 | xxxx | Little | check paid | | 28,500.00 | Lawyer fees | Barron |
| Security Bank | xxxx | 10/31/2019 | xxxx | Little | check paid | | 5,000.00 | Attorney at Law October Litigation | Barron |
| Security Bank | xxxx | 11/1/2019 | xxxx | Barron | withdrawal | | 10,000.00 | | Barron |
| Security Bank | xxxx | 12/10/2019 | xxxx | Little | check paid | | 1,000.00 | | Barron |
| | | | | | | Total: | 44,500.00 | | |

In his first issue, Little asserts that the evidence is insufficient to support his conviction for misapplication of fiduciary property valued at $30,000 or more but less than $150,000 because the evidence does not establish that BWSC was at substantial risk of losing at least $30,000. *See* Tex. Penal Code § 32.45. More specifically, he contends that there is insufficient evidence to support a determination that he misapplied the $28,500 alleged in the indictment. Building on this premise, he asserts that this differential and the remaining value of the funds allegedly misapplied ($16,000) could not support a misapplication of more than $30,000 and that, therefore, the evidence was insufficient to support his conviction.

Relatedly, in his second issue on appeal, Little contends that the evidence was insufficient to support his conviction because the evidence did not establish "any criminal conduct in payment of $16,000 in BWSC funds to" him. When presenting this issue, he does not dispute that the evidence showed that a $5,000 check from October 2019, a $10,000 cashier's check from November 2019, and a $1,000 check from December 2019 were written on the BWSC account; that those checks correspond to three of the checks alleged in the indictment; or that he received the $16,000. Instead, he asserts that the evidence showed that the checks were written after the civil suit was filed by residents seeking control over BWSC, that Barron's

22

testimony established that those checks were written on behalf of BWSC for attorney's fees, and that Barron and he as directors had the discretion to use BWSC's money to fund a defense against the civil suit. Further, Little argues that BWSC was required to defend itself in the lawsuit and could pay him a reasonable fee for providing his legal services, that he could also represent and defend Barron in the proceeding in Barron's capacity as director, and that the fees he was paid were reasonable. *See* Tex. Bus. Orgs. Code §§ 8.104, 22.054; Tex. Water Code § 67.013. Additionally, Little contends that no evidence was introduced indicating that the $16,000 "was expended for anything besides attorney['s] fees."

In his third issue, Little argues that the evidence was insufficient to support his conviction because the evidence failed to show that he had the requisite intent to commit an offense. As support for this argument, he notes that no evidence was presented showing that he was present when Barron asked Baumann to write him a check, that he was present when Barron wrote the $28,500 check from BWSC's account after Baumann refused to help, or that he was involved in the process of writing and cashing that check. Similarly, Little emphasizes that the check that Barron subsequently wrote from his personal account to Little noted that the money was for attorney's fees, that there was no testimony indicating that Little was present when Barron wrote that check or knew where the funds came from, and that Barron testified that it was his decision to sell the backhoe to BWSC. Regarding the bill of sale prepared by him and the email in which he informed Barron that he voted to approve the purchasing of the backhoe, Little contends that the bill of sale sufficiently set out the value of the backhoe and could not support an inference that he knew of any "fraud underlying the transaction." Further, Little contends that there was nothing unusual about Barron paying him by check for legal services because the evidence showed that Barron wrote several checks to him, including some for attorney's fees.

23

Building on this foundation, Little asserts that there was insufficient evidence to establish his guilt as a primary actor for the misapplication of the $28,500 taken by Barron. Regarding the law of parties, Little contends that the evidence was also insufficient because the State had the burden but failed to prove that he had the "specific intent to commit the result of the offense, which is misapplying property in a manner that involves substantial risk [of loss] to the BWSC." More specifically, he argues that the State failed to show that he participated in an alleged offense or did any act evidencing "his intent that an offense be committed," meaning that the funds be misapplied. Additionally, he contends that the evidence did not establish that he had any intent to facilitate the offense before Barron committed any alleged misapplication and that evidence regarding events occurring after the alleged misapplication could not serve to establish any culpable intent. For all these reasons, Little urges that his conviction should be reversed and that this Court should render a judgment of acquittal.

As an initial matter, we note that Lisson, who testified as an expert on nonprofit corporations, explained that if a lawyer wants to have a nonprofit pay attorney's fees, the lawyer should set up a retainer agreement specifying the terms of the representation, the lawyer's fees, and the scope of the lawyer's duty. Although Little produced an invoice, no record regarding any retainer agreement or a resolution agreeing to pay attorney's fees was presented at trial, and witnesses testified that BWSC's records do not provide any information regarding any alleged service performed by him on behalf of BWSC. Further, Little and Barron both testified that they returned all records in their possession to BWSC.

Additionally, Lisson testified that anyone who receives service from a water supply corporation is a member of that corporation and that the assets of a water supply corporation must be used solely to benefit the corporation and its members. Moreover, the

24

original articles of incorporation explained that the purpose of BWSC was to furnish water to individuals residing in Barnhart and to the surrounding rural area, and the original bylaws specified and witnesses testified that anyone owning or having a right to occupy property in the governing area has the right to become a member by paying a membership fee used for connecting to the BWSC system. The evidence also showed that the residents of Barnhart and surrounding areas were customers of BWSC and were connected to the system, and the jury was free to infer from this evidence that the residents were members of BWSC. In addition, the bylaws stated that even if the bylaws were subsequently amended by a vote of the members, the bylaws could not be amended to deprive any members of his or her rights as a member.

Despite the language of the bylaws and articles of incorporation and the fact that multiple residents were receiving water service from BWSC, Little drafted a resolution identifying Barron, Smith, and him as the only members of BWSC and transferring authority and control over its assets to them without a vote by the residents. Smith testified that Little never mentioned that he was going to prepare a document naming Barron, Smith, and Little as the only members. The resolution effectively deprived the residents of their rights as members of BWSC. Moreover, although there was conflicting evidence, two of the previous directors testified that they did not sign the unanimous resolution. In addition, Little testified that he personally drafted his own membership certificate as well as the membership certificates for Barron and Smith. Similarly, prior to the alleged misapplication of money, Little drafted and voted to approve amended bylaws giving Barron the power to sign checks on behalf of BWSC without the need for another officer or director's approval. The amended bylaws also named Barron, Smith, and Little as officers and directors even though Little did not receive water service from BWSC and even though the bylaws were not voted on by the residents. Further, as set out previously, on the

25

recording of the October meeting, Little stated that the former board sold away the residents' rights to control BWSC, that the customers were not members, and that Barron and he were "lining our pockets."

Additionally, the auditor with the Attorney General's Office, Downman, testified that BWSC typically spent money on vendors, maintenance, and a salary for the bookkeeper but that the expenditures changed when Barron and Little became directors. Specifically, Downman related that BWSC started paying for things that seemed unrelated to BWSC's purposes. Moreover, regarding the backhoe sale, Downman explained that on the same day that Barron received $28,500, he wrote Little a check for the same amount ostensibly for attorney's fees. However, Downman testified that there were no legal events involving BWSC at that time and that Barron had previously hired Little to defend him in his aggravated-assault case but had not paid him for those services. Moreover, evidence presented at trial, including Barron's testimony, established that the payment of the $28,500 at that time was unusual because Barron had in the past paid attorney's fees when legal services were rendered.

In addition, although Barron testified that he purchased the backhoe to help facilitate BWSC's purposes, other evidence was introduced contradicting that assertion. For example, the current president of BWSC, Barrera, testified that Barron used BWSC funds to purchase the backhoe after he was unable to sell it for several months, that the purchase was a waste of money for BWSC because it rarely needs to use that type of equipment and can rent the equipment when needed or rely on one of the residents to donate their equipment for a project, that BWSC did not use the backhoe after Barron sold it, that BWSC had no place to store the backhoe, and that the backhoe deteriorated while outside. In addition, Smith, who was the third director with Barron and Little, testified that Barron used the backhoe on his personal property

26

and that Barron used the backhoe for his personal use as well as for BWSC purposes. Similarly, the former bookkeeper, Baumann, explained that Barron instructed her to write him a check from BWSC's account for an amount that he specified the backhoe was worth but that the backhoe was unnecessary because their water system was new and because residents would donate their time and equipment for water projects.

Regarding Little, Baumann testified that he informed her by email that Barron and he authorized the purchase and transfer of the funds as directors and that he terminated her employment after she refused to write Barron the check without approval by the residents. In the email Little wrote to Barron attaching a bill of sale for the backhoe, Little wrote that he voted in favor of the acquisition, and the attached bill of sale stated that the purchase price was $28,500. However, Baumann related that an individual who sells backhoes informed her that the backhoe was not worth the price suggested by Barron and that the bill of sale did not provide enough information to determine its value or its condition. The current secretary for BWSC, Kuykendall, explained that BWSC rarely had to use equipment and that Barron used the backhoe on his personal property. Further, Barron wrote a check to Little for the exact same amount on the same day that Barron deposited the funds.

In his testimony, Barron admitted that he wrote himself a check from BWSC's account to purchase the backhoe because he needed money for back surgery, that he wrote a check to Little for the same amount on the same day, that he did not remember if he paid Little for defending him in the aggravated-assault case, that the $28,500 check may have been compensation for Little representing him in the criminal case, and that there was no legal business related to BWSC occurring at that time. Moreover, Little admitted that he fired

27

Baumann and received those funds after preparing the bill of sale for the backhoe, and he testified that Barron did not have any money of his own at the time.

Regarding the $16,000 that Little asserts were payment for attorney's fees for the civil lawsuits, we note as set out above that there was no retainer or other agreement in BWSC's records approving the payment of fees or setting out the terms of Little's representation, the scope of the representation, or the manner in which he would be compensated. Moreover, as discussed above, Little drafted the resolution and amended bylaws giving Barron and himself authority over BWSC's assets, and Little stated during the meeting with the residents that Barron and he took over BWSC to "lin[e] our pockets" before accepting the $16,000. In addition, regarding the civil suit initiated by the residents of Barnhart who were customers of BWSC, evidence was presented showing that the suit was prompted when BWSC funds were used to purchase the backhoe and that the suit was filed to prevent Barron and Little from draining any more of BWSC's assets. However, prior to an injunction being issued, Barron continued to make withdrawals from BWSC's account and transfer the money to Little. Further, evidence showed that after the customers filed suit, Little filed suit against the customers of BWSC on behalf of Barron and BWSC, and the jury could reasonably infer that this lawsuit was not consistent with BWSC's purpose of providing water service to the residents of Barnhart. Additionally, Barron admitted that he did not know if the $10,000 cashier's check was issued for the benefit of BWSC or its members.

Based on the preceding, we must conclude that a reasonable jury could have determined that Barron intentionally, knowingly, or recklessly misapplied BWSC's property with a value of more than $30,000 but less than $150,000 that he held as a fiduciary, that the misapplication involved a substantial risk of loss of the funds to BWSC, that the misapplication

28

occurred in a manner that was not necessary or consistent with BWSC's purpose of providing water service to the residents of Barnhart, and that the misapplication was inconsistent with the directives of the Business Organizations Code provisions prohibiting officers and directors from receiving profits from a nonprofit organization. *See* Tex. Bus. Orgs. Code §§ 22.053-.054; Tex. Penal Code § 32.45. Further, we also conclude that a reasonable jury could have determined that Little acted with the intent to promote or assist the misapplication of the property and aided Barron to commit the offense and was, therefore, liable under the law of parties. *See* Tex. Penal Code § 7.02(a)(2); *see also Amaya v. State*, 733 S.W.2d 168, 174 (Tex. Crim. App. 1986) (explaining that individual can be held accountable as party where there is "indication that they knew that they were assisting in the commission of an *offense*").

In his first issue, Little presents another argument regarding the $28,500. Specifically, Little notes that Barron sold the backhoe to BWSC for $28,500 and argues that at the point of sale, the backhoe became the property of BWSC and one of its assets as listed in the settlement agreement executed. Further, Little emphasizes that the backhoe was later sold for $24,000. In light of the preceding, Little contends that at most there is a price differential of $4,500, that the only risk to BWSC was the loss of this differential, and accordingly that the full value of the backhoe could not have been misapplied. Building on this premise, Little asserts that this differential and the remaining value of the funds allegedly misapplied ($16,000) could not support a misapplication of more than $30,000 and that, therefore, the evidence was insufficient to support his conviction. Further, Little contends that unlike theft, which requires proof of an intent to deprive rather than an actual deprivation, *see* Tex. Penal Code § 31.03, misapplication of fiduciary property requires a completed misapplication.

29

Although Little suggests that there should be some sort of offset if an entity whose property has been misapplied is able to recoup some value following the misapplication, he has not referred to any cases supporting his interpretation of the statute, and the language of the statute is not amenable to that interpretation either. *Cf. Liverman v. State*, 470 S.W.3d 831, 836 (Tex. Crim. App. 2015) (noting that "[i]n some cases, . . . a sufficiency-of-the-evidence issue turns on the meaning of the statute under which the defendant has been prosecuted" and that "[t]hat question, like all statutory construction questions, is a question of law, which we review *de novo*"). As set out above, an individual commits the offense of misapplication of fiduciary property if he misapplies property "in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held" and specifies that the offense is a third-degree felony "if the value of the property misapplied is $30,000 or more but less than $150,000." Tex. Penal Code § 32.45(b), (c)(5). The language of the statute focuses on the manner in which the alleged offender handled the property rather than requiring an accounting to determine if the victim was able to recoup some value following the misapplication.

This construction is consistent with how the Court of Criminal Appeals has construed the phrase "substantial risk of loss" and with the way courts have addressed the issue of recoupment for similar offenses. In *Casilias v. State*, the Court of Criminal Appeals explained that "substantial risk of loss" implies "a 'real possibility' of loss," meaning one that "exists but does not rise to the level of a substantial certainty." 733 S.W.2d 158, 164 (Tex. Crim. App. 1986). In other words, it does not have to be "'unlikely' that the property will be recovered, but the risk of loss does have to be a positive possibility," meaning "more likely than not." *Id.*; *Black v. State*, 551 S.W.3d 819, 831 (Tex. App.—Corpus Christi-Edinburg 2018, no pet.) (explaining that statute only requires proof of substantial risk of loss to owner, "not actual loss,"

30

and that jury could infer that initiating transaction placed funds at substantial risk of loss even though transactions were ultimately undone). However, the Court also clarified that the amount of proof needed to satisfy "the substantial risk of loss" is less than what is needed to show that someone had been "deprive[d]" of property in a theft offense where the alleged offender intended to dispose of property in a manner making its recovery "unlikely." *Casilias*, 733 S.W.2d at 164 (discussing section 31.01 of Penal Code pertaining to theft offenses).

Moreover, although Little focuses on the "intent to deprive" element for theft offenses to distinguish it from misapplication offenses, theft still requires that the defendant "unlawfully appropriate[] property" by bringing about a transfer of the title or other nonpossessory interest in the property or acquire or exercise control over the property, *see* Tex. Penal Code §§ 31.01(4), .03, which is similar to the requirement for the offense in question that the person misapply the property, *see id.* § 32.45. Additionally, for theft offenses, our sister court has explained that the later repayment of the money does not render insufficient the evidence supporting a conviction for theft. *See Ellis v. State*, 714 S.W.2d 465, 475 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd) (holding "that the temporary deprivation of the funds" supports conviction); *see also Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981) (explaining that "[t]he fact that the deprivation later became temporary does not automatically mean that there was no intent to deprive permanently or for so long as to satisfy the statutory definition").

Given the construction of the phrase "substantial risk of loss" adopted by the Court of Criminal Appeals, the Court's explanation that the evidence needed to establish that element is less than the evidence needed to establish deprivation of property for theft offenses, and the legal determination by courts establishing that the repayment or recoupment of funds

31

does not render evidence insufficient to support a conviction for similar offenses, we conclude that the evidence establishing that BWSC was able to sell the backhoe for $24,000 does not without more render the evidence insufficient to support the jury's determination that Little misapplied property in a manner creating a substantial risk that BWSC would lose $30,000 or more but less than $150,000 of its funds. *Cf. Demond v. State*, 452 S.W.3d 435, 448 (Tex. App.—Austin 2014, pet. ref'd) (observing that even if defendant provided some value, jury could still infer that defendant misapplied funds).

For all these reasons, we overrule Little's first three issues on appeal.

*Evidence Concerning Currency*

In his fourth issue on appeal, Little notes that the indictment alleged that he misapplied "property, namely United States Currency, of the value of $30,000 or more but less than $150,000"; however, he contends that the evidence from trial showed that "the means of misapplication of fiduciary property" for some of the property was executed "by [a] check drawn on the [BWSC] account made payable to Michael Barron" for $28,500. After emphasizing the evidence pertaining to the check made out to Barron, Little contends that he "did not have any signatory authority over the BWSC account or Barron's bank account" and, therefore, "never had any control over the misappropriated funds" because he did not and could not have cashed the check misappropriating money. Although Little concedes that a person "who converts a check made out to him into cash could certainly be said to exercise control over the currency represented by the check," he asserts that did not happen in this case because the "check was made out to a third party passed through the third party's hands and then allegedly to [him] in the form of another check." "In other words," Little argues that he "may have exercised control over

32

a subsequent check, but not the currency represented by the original check to Barron," did not misapply the currency as alleged, and could not have exercised "control over the [original] check to the extent that it could be treated as money." Relatedly, Little contends that because the State alleged the misappropriation of "United States Currency" as opposed to cash or money, this case presents a different situation than other appellate cases concluding that a person who exercises control over a check also exercises control over the money it represents. Little asserts that although BWSC may have had assets of value, there was no evidence that it "held any 'United States Currency' that [he] exercised control over." Moreover, Little urges that the variance between the allegations and the evidence at trial renders the evidence insufficient to support his conviction and requests that this Court reverse his conviction and render a judgment of acquittal.

As an initial matter, we note that "courts have repeatedly held that there is no variance between an indictment that alleges theft of 'money' and proof at trial that establishes theft of a 'check.'" *See Chachere v. State*, 811 S.W.2d 135, 136 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd); *see also Jackson v. State*, 646 S.W.2d 225, 226 (Tex. Crim. App. 1983) (overruling sufficiency challenge arguing evidence was insufficient because indictment alleged theft of money but evidence showed theft of check that had been cashed by defendant); *Grogen v. State*, 745 S.W.2d 450, 451 (Tex. App.—Houston [1st Dist.] 1988, no pet.) (same). This is because "a check is considered the same as cash" in most cases "due to the ease of negotiating the check into cash," *Chachere*, 811 S.W.2d at 136, and due to the fact that checks are simply the instrumentality by which someone receives cash, *Jackson*, 646 S.W.2d at 226; *Kirkpatrick v. State*, 515 S.W.2d 289, 293 (Tex. Crim. App. 1974). Moreover, in this case, the indictment specified that the "making and receiving" of the currency was effectuated

through the five checks discussed above. *Cf. Compton v. State*, 607 S.W.2d 246, 252 (Tex. Crim. App. 1979) (on reh'g) (explaining that once defendant negotiates check, he exercises control over it and its proceeds). Furthermore, although Little contends that there is a significant distinction between the term "currency" as alleged in the indictment and the terms "money" and "cash" rendering the above cases and others inapplicable, we do not agree with that distinction because currency is a synonym for cash and money. *See Cash, Currency,* and *Money*, Thesaurus.com, https://www.thesaurus.com (last visited March 7, 2023); *see also Cash*, Dictionary.com, https://www.dictionary.com/browse/cash (defining cash as "money or an equivalent, as a check") (last visited March 7, 2023); *Currency*, Dictionary.com, https://www.dictionary.com/browse/currency (defining currency as "something that is used as a medium of exchange; money") (last visited March 7, 2023); *Money*, Dictionary.com, https://www.dictionary.com/browse/money (defining money as "any circulating medium of exchange, including coins, paper money, and demand deposits" and "checks") (last visited March 7, 2023).

Accordingly, to the extent that Little is asserting that there is a variance between the allegations in the indictment and the proof offered at trial because the indictment alleged misapplication of currency rather than misapplication of checks, money, or cash, we cannot agree with Little's assertion that the alleged variance renders the evidence presented insufficient to support his conviction. Moreover, as set out above, the jury charge included instructions on the law of parties, and for the reasons discussed previously, the evidence was sufficient to allow the jury to reasonably infer that Little acted with the intent to promote or assist Barron in the misapplication of BWSC's property, including the $28,500 in funds transferred from BWSC to Barron, and aided Barron to commit the offense. *See* Tex. Penal Code § 7.02(a)(2); *see also*

34

*Ammons v. State*, 782 S.W.2d 539, 541 (Tex. App.—Houston [14th Dist.] 1989, no pet.) (explaining that "a party to an offense may be charged without alleging facts which make the defendant a party to the offense and criminally responsible for the conduct of another" and noting "that an indictment which does not give reference [to] the law of parties does not present a constitutional infirmity").

For these reasons, we overrule Little's fourth issue on appeal.

**Indictment Amendment**

In his final issue on appeal, Little asserts that the trial court erred by allowing the State to amend the indictment. Specifically, he notes that the trial court agreed to amend the indictment by adding language stating that the allegedly improper payments made and received were "particularly described on Attachment A" and attaching to the indictment a list of the five checks discussed above. However, Little asserts that the amendment was improper because the incorporation of the list of checks in Attachment A was not part of the face of the indictment, an interlineation of the original indictment, or an amended photocopy of the original indictment. Instead, he contends that Attachment A was a separate document that was not part of the indictment and, therefore, could not be considered a valid amendment. Further, he argues that the trial court's authorization of the amendment harmed him because the amendment "goes to the heart of the contested issues" at trial, which he contends were the amount of money allegedly misapplied, whether he had the requisite intent to commit an offense, and whether there had been a misapplication. Additionally, he contends that the invalidly amended indictment did not allow him to prepare a defense prior to trial and allows for the possibility of him being prosecuted

again for the same offense. Accordingly, Little asserts that this Court should reverse his conviction and remand the case with instructions for the trial court to dismiss the case.

In response to the State's motion to amend the indictment, Little filed a reply asserting that the proposed amendments did not provide him notice of what he was accused, that the shorter time period identified in the attachment in which the allegedly improper transfers occurred was not consistent with the longer time period alleged in the indictment, and that the amended indictment did not inform him how he acted recklessly. Little also argued that the payments he received were for reasonable attorney's fees and reasserted his claim from earlier motions that the trial court should quash the indictment. During the hearing on the State's motion to amend, Little's motion to quash, and other motions, Little asserted that indictment did not specify how he recklessly spent the allegedly misapplied money, that the amount of money allegedly misapplied fell below the $30,000 minimum listed in the indictment, that the evidence will show that he did not misapply money, and that the State failed to comply with various discovery requests. However, Little did not make any assertion regarding the propriety of amending the indictment to include Attachment A.

Under article 1.14 of the Code of Criminal Procedure, a defendant "waives and forfeits the right to object" "to a defect, error, or irregularity of form or substance in an indictment" and "may not raise the objection on appeal" if he "does not object to [the] defect, error, or irregularity . . . before the date on which the trial on the merits commences." Tex. Code Crim. Proc. art. 1.14(b); *see Jones v. State*, 907 S.W.2d 850, 857 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd); *see also Ex parte Jessep*, 281 S.W.3d 675, 680 (Tex. App.—Amarillo 2009, pet. ref'd) (noting that "[t]he statute serves the purpose of ensuring that indictment defects may be objected to and repaired pretrial but would not invalidate an otherwise valid conviction if

not raised before trial"). Little's complaint concerns an alleged "defect, error, or irregularity of form or substance in the" amended indictment, and he was therefore "required to raise an objection prior to trial." *Jones*, 907 S.W.2d at 858. By failing to object before trial to the allegedly improper amendment on the grounds presented on appeal, Little is prohibited from presenting those arguments here. *See* Tex. Code Crim. Proc. art. 1.14(b); Tex. R. App. P. 33.1; *Duffy v. State*, 33 S.W.3d 17, 26 (Tex. App.—El Paso 2000, no pet.); *see also Jenkins v. State*, 592 S.W.3d 894, 902 (Tex. Crim. App. 2018) (recognizing that Texas law requires defendant to object to any error in indictment before trial).

Even if Little's objections could be construed as attacking the propriety of amending the indictment to include Attachment A, we would be unable to sustain his fifth issue. The Court of Criminal Appeals has explained that making interlineations in the original indictment is an acceptable but not exclusive way to properly amend an indictment and expressly overruled prior cases requiring actual physical interlineation of the original indictment. *See Riney v. State*, 28 S.W.3d 561, 565-66 (Tex. Crim. App. 2000). In that case, the Court also approved the filing of an interlineated photocopy of the indictment. *Id.* In light of the analysis from *Riney*, our sister court has interpreted the case "as allowing flexibility in amending indictments provided that the method of amendment employed produces an amended copy of the indictment incorporated into the record under the direction of the trial court sufficient to give the defendant fair notice of the charges," *see Harrison v. State*, No. 05-07-00453-CR, 2008 WL 2514333, at *1 (Tex. App.—Dallas June 25, 2008, no pet.) (op., not designated for publication), and we agree with that interpretation, *see* Tex. Code Crim. Proc. art. 28.11 (explaining that indictment amendments "shall be made with the leave of the court and under its direction").

In this case, the State set out the proposed changes in its motion to amend, including Attachment A, and the proposed amendment to the indictment was approved by the trial court after it was discussed during a hearing in which the parties were given the opportunity to present argument regarding the propriety of the proposed changes. Like the original indictment, the amended indictment was made part of the clerk's record. As discussed above, the proposed changes included Attachment A and the interlineations made to a copy of the indictment clarifying that the allegedly improper payments made and received were described in Attachment A. Both the interlineation on the copy of the indictment and Attachment A bear the trial judge's initials and date of the modification. On this record, we conclude that the amendments met the objectives for an amendment set out in *Riney*. *See Barfield v. State*, 202 S.W.3d 912, 920-21 (Tex. App.—Texarkana 2006, pet. ref'd) (upholding amendment made by attaching copy of language from State's motion to order granting amendment and stating "SEE ATTACHED" in order); *Westmoreland v. State*, 174 S.W.3d 282, 287 (Tex. App.—Tyler 2005, pet. ref'd) (concluding that trial court's order granting State's motion to amend was sufficient to amend indictment where State's motion included original indictment language and proposed changes, where defendant was present at hearing and had notice of amendment, and where order granting motion included amended language to original indictment requested by State).

For these reasons, we overrule Little's fifth issue on appeal.

## CONCLUSION

Having overruled Little's five issues on appeal, we affirm the trial court's judgment of conviction.

_____

Thomas J. Baker, Justice

Before Justices Baker, Kelly, and Smith

Affirmed

Filed:   March 9, 2023

Do Not Publish